(C. D. 523)

GALLAGHER & ASCHER CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 25, 1941)

*G. W. R. Wallace; Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel), for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Samuel D. Spector,* special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States originating at the port of Chicago brought to recover certain customs duties alleged to have been improperly exacted upon a particular importation described on the invoice as "2 Welding Machines." The merchandise was assessed for duty at 30 per centum ad valorem under the provision for "machine tools" in paragraph 372, Tariff Act of 1930. The merchandise is claimed to be properly dutiable at the rate of 27½ per centum ad valorem under the provisions for "machines having as an essential feature an electrical element or device" in paragragh 353 of said Act, as modified by the trade agreement with the United Kingdom, dated November 25, 1938, and promulgated in T. D. 49753, 74 Treas. Dec. 253. The merchandise is alternatively claimed to be properly dutiable at 27½ per centum ad valorem under paragraph 372 of the said act as machines not specially provided for.

At the hearing in this case held at Chicago on March 13, 1941, before Evans, Judge, the plaintiff offered in evidence the testimony of a

single witness, David Wendell Frentress, development engineer in the employ of the Chicago Metal Hose Corporation, the ultimate consignee and the real importer herein.   After his qualifications had been established, the witness testified in part as follows:

Q. Now, referring to the articles described as two welding machines, will you describe them to the court.—A. You would like a description of the welding machine as received?

Q. That is right, what we are quoting of the article imported and entered under the term steel welding machines.—A. The article as received by us consisted chiefly of a framework of gears and a casing around those gears, a stand and 8 shafts.   *   *   *   In other words, it was something like an automobile chassis without the motor.   Just a bare framework without the internal parts.

Q. After the importation of the articles in question, what did you do?—A. We first had to attach, to motorize it by means of an electrical motor, to give it the rotating action required to handle the material.   We had to make the tools that fit on the axles.   *   *   *   We had to make the housings which guided the flat metal strip into a tubular form, and we had to mount the welding parts which transformed the flat strip into a welded hose as the progression of the work went on.

Q. Will you please describe the manner in which the welding machines are used after completion in your plant.—A.   *   *   *   The method of operation is as follows: A flat coil, the flat strip metal, depending on the size of the product, *   *   *   is drawn through the machinery, and as it is drawn through, it is slowly formed into the circular form, and when it reaches the completed circular form, the two abutting edges of the strip meeting   *   *   *   are brought under an oxyacetylene flame which seriates the two edges together.   It is what is known as autogenous welding,   *   *   *

Q. In the operation of the completed welding machine is a tool employed for work on metal?—A. No, you could not rightfully say a tool was employed for work on the metal.

Q. Why not?—A. Well, the tool in this machine would be the torch because the torch is the medium or the factor which is responsible for the tube.   *   *   *

Q. Is it a fact that this welding machine employs a flame for work on metals?—A. Yes, definitely it is.

Q. What mode of power is used to operate the completed welding machines?—A. Electrical motor.

Q. Why is that used?—A. Well, the electrical motor is used because the current is of such arrangement and disposition that a slow revolving motion is required in the axles   *   *   *   they must turn slowly and in the gear box is a gearing arrangement which takes that slow motion and releases it to fast motion, so that you can take an electrical motor and attach it to the machine.

Q. Is that gearing included in the machines in their condition as imported?—A. Yes.

Q. And in order to operate the completed machines by power other than electricity what would have to be done?—A. You would have to either change the gearing in the machine or evolve some mechanism that would give the same type or mode of power as an electrical motor.   *   *   *

Upon cross-examination the witness testified in part as follows:

X Q. Now, the strip which you are working on is led through certain tools before it reaches completion?—A. Yes, it is drawn through a forming apparatus.

X Q. These tools were not included in the importation as it came from Switzerland?—A. That is correct.

X Q. They were added here in the United States?—A. Yes.

X Q. Now, these tools were necessary in order to shape your striping or whatever you are working on?—A. Some tool, if not the one we used, some such tool would be needed.

X Q. And the machine without these tools is useless?—A. I would not say it would be useless, it would mean you would have to weld in a different manner.

\*       \*       \*       \*       \*       \*       \*

X Q. Without the tools, you could not operate the machine?—A. Without the tools we added, the machine would be inoperatable.

\*       \*       \*       \*       \*       \*       \*

X Q. Was the acetylene torch included in the importation?—A. The torch was not included.

X Q. That was added?—A. Yes.

\*       \*       \*       \*       \*       \*       \*

X Q. The machine has two functions, one to form the hose, and the second to weld it, is that right?—A. As it stands in our plant, it does, yes.

\*       \*       \*       \*       \*       \*       \*

X Q. In other words, the welding tool remains as is, regardless of what you are doing, but the shaping tools have to be according to the article you desire to form, is that correct?—A. Yes.

X Q. Now, these appliance tools or whatever you call them were not with part of the machine when the machine was imported into the United States?—A. No they were not a part of it.

X Q. And the machine could not operate without these appliances and tools?—A. Correct.

On redirect examination the witness testified in part as follows:

R Q. You mentioned certain tools which were necessary to shape the metal. Will you please tell us just what those are; what they did, and how they operate?—A. Well, the tool that is used to convert the flat strip into a tubular form consists of a trough which is approximately five feet long which will be longer or shorter, depending on other conditions.  It is down at one end and flat so it will receive the strip in its form, and progressing, starting at that point, this strip is gradually formed by curling its edges, and then more and more it is progressively formed into a semicircle, three-quarters—

Judge EVANS. That is by a series of rollers or is it drawn into it so shaped?

The WITNESS. That is what I am trying to describe.  It is under rollers.  It is a trough, and the oblong bars come from under the rollers, and they draw the tube through.  The rollers would engage the finished welded tube, and keep it pulling through, whereas the trough is just a cut to drag the flat strip into circular form.

\*       \*       \*       \*       \*       \*       \*

R Q. When you speak of the tools necessary to shape the metal, did you mean the trough?—A. Yes, the trough is really a tool.  It is a single piece of metal shaped by hammering and pounding into this trough-like form.   \*   \*   \*

Upon this record counsel for the plaintiff in his brief filed herein contends that the only so-called tool used in this machine is the acetylene torch, and cites the case of *Keith Dunham Co.* v. *United States*, 26 C. C. P. A. 250, C. A. D. 24, in which it was held that a certain machine known as a "secator," employing an acetylene torch

for the purpose of cutting metal plate, was not a machine tool within the meaning of paragraph 372 of the Tariff Act of 1930. While this decision is controlling as to the acetylene torch, the record herein plainly discloses that before the acetylene torch is applied other tools are employed by the machine at bar in shaping the steel material into a tubular form.

On cross-examination the only witness for the plaintiff testified that the machine in question was exclusively used for work on metal, and that it performed two separate functions, namely, the shaping of the steel and its subsequent welding; and that the so-called trough was really a tool. Moreover, it has uniformly been held that forming and shaping machines come within the category of machine tools. In the case of *Keith Dunham Co.* v. *United States, supra,* cited by counsel for the plaintiff, page 254, the appellate court said:

Machine tools are also discussed in the Summary of Tariff Information, 1929, at page 812, as follows:

MACHINE TOOLS

*Description and uses.*—Machine tools are more or less massive apparatus for working metal. The principal parts of the machine tool are the frame, the driving mechanism, the device for holding or moving the material or tool, *and the actual tool that shapes the material being worked* * * *
[Italics ours.]

In the very recent case of *Alex Benecke* v. *United States,* C. D. 509, we held that certain steel rolls were parts of machine tools within the meaning of the Congressional definition thereof set forth in paragraph 372 of the Tariff Act of 1930, on the ground that the said rollers accomplished the work formerly performed by hand hammers and were therefore tools, citing as authority the case of *John L. Vandiver* v. *United States,* T. D. 37555—G. A. 8142, 34 Treas. Dec. 200.

The only question remaining is as to the relative specificity of paragraph 372 as compared with paragraph 353, under which the plaintiff claims. In the case of *Schmidt & Wezel, Inc.* v. *United States,* Abstract 23354, 63 Treas. Dec. 1358, referring to the Congressional definition of a machine tool in paragraph 372 of the Tariff Act of 1930, we said:

As so framed, the provision is not only an *eo nomine* classification for a particular class of machines, but likewise a designation by use. As such, it must necessarily take precedence over the general descriptive language of paragraph 353, particularly since all of the articles mentioned in the latter are qualified by the words "not specially provided for." To hold otherwise would mean that all electrically driven machine tools would be excluded from the congressional definition thereof. We do not think that such was the legislative purpose. * * *

Upon all of the facts and the law we therefore hold that the welding machines constituting the imported merchandise at bar are properly dutiable at 30 per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as machine tools, as classified by the collector. All claims of the plaintiff are therefore overruled.