(C. D. 701)

DAVIES, TURNER & CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 31, 1942).

*Wallace & Schwartz* (*Joseph Schwartz* of counsel) for the plaintiffs.
*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett* and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of Chicago, brought to recover certain customs duties alleged to have been improperly exacted upon a particular importation described in the invoice as "one special electric welding machine for the production of corrugated flexible tubing," imported

from Switzerland. Duty was levied thereon at the rate of 30 per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as a machine tool. It is claimed that said merchandise is properly dutiable at but 25 per centum ad valorem under the provision in paragraph 353 of said act for "electrical * * * welding * * * apparatus, instruments (other than laboratory), and devices," as modified by the trade agreement between the United States and the United Kingdom promulgated in T. D. 49753, 74 Treas. Dec. 253.

At the hearing, held at Chicago on March 17, 1942, the plaintiffs offered in evidence the testimony of a single witness, David Wendell Fentress, vice president of the Chicago Metal Hose Corporation, the ultimate consignee and the real importer herein; who testified that previous to his present position he was a development engineer, having specialized in metallurgy at Lehigh University; that he recalls the receipt at his company's plant of the machine involved herein; that he had seen the said machine after installation in actual operation; that the said machine is an electrical welding machine for the production of corrugated flexible electrically welded tubing; that the raw material is drawn over a revolving spindle, and wrapped thereon, so that a helically-wrapped tubing of cylindrical shape is formed; that the edge of the strip as it is wrapped on to an arbor is so wrapped that the right-hand edge overlaps the left-hand edge on each turn; and that the overlapping portion is welded as it revolves under a welding wheel.

At this juncture a drawing of the welding area and of the forming parts of the machine in question was admitted in evidence as illustrative exhibit A, and a piece of metal representing a short length of completely finished tubing was admitted in evidence as illustrative exhibit B.

The witness then testified that the machine in question is designed to make two sizes of tubing, to wit, $\frac{5}{16}$ and $\frac{3}{8}$ of an inch inside diameter. He then described in detail the operation of the machine and stated that a flat strip of metal enters the machine and a complete coil, such as illustrative exhibit B, leaves the machine; that the principal function of the machine is to weld by the electric resistance welding process a corrugated flexible metal tubing; that in so doing it is necessary that a flat piece of metal be formed or shaped before it is welded; that a machine of this type would not be used simply for forming or shaping metal, such shaping or forming being merely incidental to the welding process; that the machine employs what is commonly known as tools, to wit, the parts marked on illustrative exhibit A with the letters "d," "e," "f," "c," and "b"; that previous to the operation of the foregoing tools, there is a grooving apparatus through which the strip is drawn to give it its approximate U-shape form, as shown in illustrative exhibit B; and that there is a marked

difference between electrical welding and acetylene welding, which difference was described in detail by the witness.

The witness further testified that he had appeared in a previous case decided by this court in *Gallagher & Ascher Co.* v. *United States* (7 Cust. Ct. 16, C. D. 523) wherein the machine involved was different from the instant mechanism, the former being an acetylene welding machine in which a flat strip of metal was welded on to a tube by means of an oxygen acetylene torch, while the present machine in its imported condition had an electric motor which is an essential feature of said machine; that corrugated flexible tubing, as shown on illustrative exhibit B, could not be welded until the metal was first coiled; and that the purpose of preshaping the metal is to allow for the insertion of the wires marked "b" on illustrative exhibit A, to facilitate the welding of the tubing, as well as to give the tubing the proper shape when it is finished.

On cross-examination the witness testified in part as follows:

X Q. Based upon your experience, would you say that the work done by the parts of this machine which you have described, the parts which shape this metal strip into tubings, that work that was done previously by hammer, or how was it done previously to this machine?—A. This particular construction was never made prior to this time, inasmuch as this is a different departure from making flexible tubing.

\*          \*          \*          \*          \*          \*          \*

X Q. In shaping tubing generally, you hammer the strip into the shape you want it, don't you, or roll it?—A. Yes.

X Q. Roll it, bend it, or hammer it; is that right?—A. I would not use a hammer, unless you are speaking of prehistoric days.

X Q. This machine takes the place of those prehistoric methods; is that right?—A. Yes.

X Q. Were these copper wires part of the machine, the copper wires in Illustrative Exhibit B?—A. The copper wires were not part of the machine. They are used in the process, but they were not part of the importation.

\*          \*          \*          \*          \*          \*          \*

X Q. What portions of the machine are missing from the sketch that you have prepared as Illustrative Exhibit A?—A. Roughly speaking the portions of the machine not shown in Illustrative Exhibit A are the base, the framework, the motor that propells the arbor and the rollers, and a drawing head through which a strip is drawn to give it its approximate U-shape form in the cross-section.

X Q. Are there any other parts missing?—A. Only if I were to go into greater detail to explain the gears, and cams, and meters, and gauges, and valves on the machine.

X Q. Those gauges, valves, cams, are all necessary to the production of the tubing?—A. Basically they are.

X Q. You couldn't produce the tubing without them, could you?—A. Not without all of them, no.

\*          \*          \*          \*          \*          \*          \*

X Q. You have stated "d", "e", "f", "c", and "b", on Illustrative Exhibit A are tools?—A. They are.

X Q. Are there any other tools on the machine that are not represented by the exhibit?—A. There is a forming head which may or may not be called a tool. It affects the shape of the strip prior to the forming operation about arbor "c".

X Q. That is missing from Illustrative Exhibit A?—A. That is missing from Illustrative Exhibit A.

\*      \*      \*      \*      \*      \*      \*

X Q. If there was no strip of steel rolled or formed into the circular tubing by this machine when it operates, there wouldn't be anything to weld, would there?—A. That is correct.

On redirect examination the witness testified as follows:

R Q. Referring to the copper wire which is shown in Illustrative Exhibit B, is that removed from the tubing, or is that left in the tubing, or what happens to it? I am referring to the finished tubing.—A. That copper wiring can be left in the tube, and can be removed. For some uses we remove it, but for other uses where we wish to limit the diameter of the bend to which the tubing is allowed to arch we leave the wires in there.

On recross examination the witness testified in part as follows:

R. X Q. Do I gather from your testimony that the function of this machine as it was at the time of importation was to make the steel tubing and weld it? It has two functions? It makes the tubing and welds it?—A. I would say not, because the tube would not be properly called a tube if not welded. \* \* \*

R. X Q. But the machine performs both functions, is that not right; makes the tubing and welds it?—A. That is correct.

Upon this record it is plainly evident that the machine constituting the imported merchandise at bar, being operated other than by hand power and employing tools for work upon metal, would accurately respond to the congressional definition in said paragraph 372 of what constitutes a machine tool. However, it is also an electrical welding apparatus, instrument, or device within the meaning of said paragraph 353, as that provision has been modified by the trade agreement with the United Kingdom, *supra*. The evidence is uncontradicted that the instant machine is essentially an electrical welding machine, its other function of shaping or forming metal being incidental to that of welding the shaped metal into tubing, which is the primary purpose for which the machine was constructed and designed.

In our opinion the provision for electrical welding apparatus is the more specific classification for this machine. Indeed, to hold otherwise would leave such provision virtually inoperative. As we view it, the decision in *Gallagher & Ascher Co.* v. *United States, supra*, is not here controlling. There, the competition was between the provision for machine tools in paragraph 372 and one covering machines having as an essential feature an electrical element or device, in paragraph 353 of said act as modified by said trade agreement. Here, the competition is between the machine tool provision and one covering electrical welding apparatus, instruments, and devices. Obviously the latter provision is the more specific for the imported electrical welding machine.

Upon the established facts and the law applicable thereto we therefore hold that the machine in question is properly dutiable at the rate of 25 per centum ad valorem under the provision for "electrical * * * welding * * * apparatus, instruments * * * and devices" under said paragraph 353, as modified by the trade agreement with the United Kingdom, T. D. 49753, as alleged by the plaintiffs. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.