**PITNEY–BOWES, INC.**

v.

**UNITED STATES.**

**C.D. 3116; Protest Nos. 65/14331–19350–65.**

United States Customs Court,
Second Division.

Sept. 14, 1967.

Barnes, Richardson & Colburn, New York City (James F. Donnelly and Rufus E. Jarman, Jr., New York City, of counsel), for plaintiff.

Carl Eardley, Acting Asst. Atty. Gen. (Arthur H. Steinberg, trial attorney), New York City, for defendant.

Before RAO, FORD, and BECK-WORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in this case consists of electrically operated rapid embossing machines for plates, Model 790, sometimes referred to as Model 90. They were imported from West Germany on November 3, 1964, and were assessed with duty at 15 per centum ad valorem under item 674.35, Tariff Schedules of the United States, as metal-working machine tools. It is claimed that the machines are not machine tools but are properly dutiable at 10 per centum ad valorem under item 676.30, as office machines, not specially provided for, or free of duty under item 676.05, as nonautomatic typewriters with hand-operated keyboard.

The pertinent provisions of the tariff schedules are as follows:

Schedule 6, part 4, TSUS

| Item | Articles | Rates of Duty 1 | 2 |
|---|---|---|---|
| | Subpart F. — Machines for Working Metal, Stone, and Other Materials | | |

Subpart F Headnotes:

1. For the purposes of this subpart—

(a) the term *"machine tool"* means any machine used for shaping or surface-working—

    (i) metals (including metallic carbides);

    (ii) stone, ceramics, concrete, asbestos-cement and like mineral materials, or glass in the cold; or

    (iii) wood, cork, bone, hard rubber or plastics, or other hard materials,

whether by cutting away or otherwise removing the material or by changing its shape or form without removing any of it, but does not include rollingmills (Item 674.-20) or the hand-directed or controlled tools provided for in items 674.60 and 674.70 of this subpart and in Item 683.20 of part 5 of this schedule; and

(b) the term *"metal-working"* includes metallic-carbide-working.

\*    \*    \*    \*    \*

| Item | Articles | Rates of Duty 1 | 2 |
|---|---|---|---|
| | Machine tools: | | |
| | Metal-working machine tools: | | |
| 674.30 | Machine tools for cutting or hobbing gears | 20% ad val. | 40% ad val. |
| 674.32 | Boring, drilling, and milling machines, including vertical turret lathes | 12% ad val. | 30% ad val. |
| 674.35 | Other | 15% ad val. | 30% ad val. |

\*    \*    \*    \*    \*

Subpart G. — Office Machines

Subpart G.    Headnotes:

1. This subpart does not cover—

    (i) weighing machines (see subpart A of this part and subpart D of part 2 of schedule 7);

    (ii) bookbinding and printing machinery (see subpart D of this part);

    (iii) mathematical calculating instruments or revolution and other counters (see subparts C and D of part 2 of schedule 7);

    (iv) hand tools not having a base for fixing or placing them on a table, desk, wall, floor, or similar place (see part 3E of this schedule).

2. For the purposes of this subpart—

    (a) the term *"office machines"* refers to machines which are used in offices, shops, factories, workshops, schools, depots, hotels, and elsewhere, for doing work concerning the writing, recording, sorting, filing, mailing of correspondence, records, accounts, forms, etc., or for doing other "office work", and which have a base for fixing or placing them on a table, desk, wall, floor, or similar place; and

    (b) a *"calculating mechanism"* is one designed to perform one or more of the four arithmetical operations, i. e., addition, subtraction, multiplication, and division.

Typewriters not incorporating a calculating mechanism:

| | | | |
|---|---|---|---|
| 676.05 | Non-automatic with hand-operated keyboard ...... Free | Free |

\*    \*    \*    \*    \*

| | | | |
|---|---|---|---|
| 676.30 | Office machines not specially provided for .............. 10% ad val. | 35% ad val. |

Plaintiff called four witnesses at the trial:

(1) Armand A. Benoit, assistant to the executive vice president for Pitney-Bowes, Inc., the plaintiff herein, who has been employed by Pitney-Bowes for about 5 years doing liaison work with its overseas subsidiary; had previously been employed for 2 years as director of manufacturing liaison in the portable typewriter division of the Remington Rand Division of Sperry Rand, and had been employed for 24 years with the Underwood Corporation, now known as the Olivetti-Underwood Corporation, in various capacities, most recently as works manager of the Bridgeport plant;

(2) Alfred Jacobs who has been employed by Pitney-Bowes in various capacities since 1950 and is presently sales manager for addresser-printers;

(3) Alan Frederick Stocker who has been employed by Farrington Business Machines Corporation in the United States for 15 months and was previously employed by its English subsidiary, Adrema, Ltd., of London;

(4) Prescott A. Smith, Associate Professor of Mechanical Engineering at the Massachusetts Institute of Technology.

Mr. Benoit testified that the machine involved here was produced in the Berlin works of Adrema-Werke, a subsidiary of Pitney-Bowes. A photograph of it (plaintiff's exhibit 1) depicts a fairly large console floor-mounted machine. Mr. Benoit described it as an electrically operated machine used for the purpose of embossing metal plates, one of which was received in evidence as exhibit 2. The machine is operated by inserting the metal plate, moving a pointer on a dial above the head of the machine to the particular letter or character desired and activating the machine. The machine has upper and lower types which straddle the metal plate. The upper types have raised characters and the lower types matching depressed characters. When the characters are in position and the motor action tripped, the lower type comes up to the underside of the plate and supports it, and the upper type comes down and presses the metal between the two types, thus forming the letter or character on the plate. As Mr. Jacobs said, the machine in effect "types" a name and address or other information on a metal plate.

The external contours of the plate are not changed by the embossing, but there is a change in the surface of the plate where the characters appear. The amount of displacement of the metal is rather slight, and there is no removal of unwanted material in the process. Mr. Benoit was unable to say whether there was any thinning of the material thereby.

The principal use of an embossing machine is to make impressions on metal plates which have an end use in an office machine system. It is operated by typists and clerical people normally employed in offices. The embossed plate is kept in a plate file and is used in an addresser-printer or addressing machine to print out the name, address, or other information on the plate onto envelopes, invoices, bills, etc. Such embossing machines are sold as part of a system of office equipment. In the experience of Mr. Benoit, an embossing machine is never sold without a simultaneous sale of a machine to print from the plate that it makes, but not all customers who buy addressing machines also buy embossing machines. They may have plates embossed at an embossing center operated by Pitney-Bowes.

Mr. Jacobs testified that he has handled sales of embossing machines throughout the United States, has traveled himself, and has charge of about a thousand salesmen. He has sold these machines to schools, municipalities, real estate agents, wholesalers, hospitals, retailers, and insurance companies. They are used in an office or in the administrative part of a school or hospital where they have typewriters, adding machines or calculators. He had never seen an embossing machine used in a warehouse or shipping department. They are invariably used with an addresser-printer.

Mr. Benoit compared the embosser to a typewriter, stating that both have certain parts which are very similar in shape and function, but that they also have differences. In his opinion, an embossing machine is not a typewriter. Mr. Jacobs testified that one does not have to be a typist to operate an embossing machine and that it is not sold as a typewriter.

It appears from the testimony of Mr. Stocker that prior to the last war Adrema, Ltd., of London had been a sales subsidiary of Adrema-Werke of Germany. Its production thereafter had at first been dependent on the designs, equipment, tooling, or other experience of Adrema-Werke of Germany, but it has since developed its own line of equipment. It produces and sells embossing machines which compete with the Pitney-Bowes model 790, perform the same function, and are sold to the same class of users.

The chief difference is that the Farrington machines can be arranged to emboss plastic as well as metal, by the use of different type heads. When used on metal, the machine embosses a plate similar to exhibit 2. When used on plastic, it produces raised characters on a plastic plate. It embosses air travel cards, credit cards, and identification badges. It is usually used with an addresser-printer as part of a system. One of the Farrington embossers has a keyboard similar to that of a typewriter for use in selecting the characters for embossing. The witness has instructed clerks in offices, not machinists, in the use of the embosser.

Mr. Benoit said the definition of a machine tool in headnote 1, subpart F, part 4, or schedule 6, supra, is acceptable as far as it goes, but that it does not completely cover his concept of a machine tool, which he derived from his factory experience. In his view, a machine tool is one which produces repetitively over and over again the same thing, but he recognized that machine tools can be used also to produce one of a kind. They produce parts for another machine or other machines. He thought that an electric can opener could be considered a machine tool under the definition in the headnote since it is a machine which cuts away metal, and that an electrically-operated paper stapler could be so considered because it bends or changes the form of metal.

Mr. Smith, prior to giving his opinion, testified that he graduated from M. I. T. in 1935 and entered the machine tool industry at the Pratt & Whitney Company in Hartford, Connecticut, where he worked in the factory for one year on machine tools, then went to the production engineering office, where he determined what machine tools should be used to produce parts. He was later employed by the United States Shoe Machinery Corp., as machine tool equipment engineer, and the Hemphill Company, as a production engineer and factory manager. Since 1945, when he joined the faculty of mechanical engineering at M. I. T., he has been in charge of the machine tool laboratory which is the largest laboratory of any school in the country and has about 200 machine tools. He is a member of the American Society of Mechanical Engineers and the American Society of Tool and Manufacturing Engineers. In the past 20 years, he has published many technical papers and parts of books, a list of which was received in evidence as illustrative exhibit 9. In addition to teaching and research, he devotes a substantial amount of his time to personal consulting in the field of manufacturing and machine tools with manufacturers, users and others.

Mr. Smith said that in his opinion the definition of machine tools in headnote 1, supra, does not describe or define a machine tool by any standard that he had ever known. Based on his years of experience with machine tools, a reasonable description of a machine tool is a machine capable of producing machine parts or used in the construction of other machines or other machine tools. It must have that capability. He said that a machine tool changes the shape of a given material, but not every machine that

changes shape is a machine tool; it must be useful in the construction of a machine or a machine tool.

Mr. Smith also testified that the term "surface working" is a difficult concept but that in his study, reading, teaching, and consulting experience in the machine tool field, the term is confined to the actual treating of surfaces, i. e., polishing, buffing or working on the surface.

Based upon his experience, he divided machine tools into the following three classes:

*Group I—Material cutting machine tools.*

Those that change the shape of material by removing the excess in the form of chips. This group may be further subdivided as follows:

*Subgroup A:*—general purpose machine tools such as lathes, drill presses, shapers, milling machines, planers, surface grinders and cylindrical grinders.

*Subgroup B:*—limited purpose machine tools such as turret lathes, single spindle automatic screw machines, centerless grinders, thread rolling machines, thread grinding machines, automatic thread chasing machines, gear milling machines, gear shaping machines, gear shaving machines and gear grinding machines.

*Group II—Plastic deformation machine tools.*

Those that form material by force in such a manner that when the force is released, the material retains the new form, such as punch presses, bending brakes, shears, cone-heading machines, hydroform machines, flow-turning machines. These machines do not remove material. The group has only been recognized as a machine tool category for about 20 years.

*Group III—New, "exotic" machine tools.*

Experts might differ as to whether this group is a machine tool category. It includes such machines as the laser, the electric discharge machine, electro-chemical machines, and machines which perform chemical milling [R. 88–90].

Mr. Smith had seen the Pitney-Bowes embosser operate and has examined its structure and components. He had also seen the Farrington 620 operate. Based upon his experience, he would classify them as office or commercial equipment, not as machine tools. The operation they perform is not a machine-tool operation because the plates cannot be used in the construction of a machine or a machine tool. No material has been removed in the operation but the surface has been embossed, that is, one surface has been raised while the other surface has been depressed. The material has been moved from one plane up some distance to another plane.

Mr. Smith stated that in his opinion an electric paper stapler is not a machine tool although it changes the form of metal by bending the straight legs of the staple.

The defendant called J. Eardley, customs examiner in New York, who was familiar with the classification of embossing machines, both at New York and other ports. He said they have been classified as machine tools under paragraph 372 in the Tariff Act of 1930, and not under the "basket" provisions of either paragraph 353 or paragraph 372, but that an embossing machine for use on plastic would not have been classified as a machine tool prior to the effective date of TSUS.

The plaintiff contends that the embossing machine in question is not a "machine tool" because (1) it is not described by the language of headnote 1, supra; (2) it is not a "machine tool" within the intent of Congress, and (3) even assuming it is a "machine tool," it is the intent of Congress that it be classified as an office machine. Defendant contends, however, that the embossing machine before us falls within the definition of "machine tool" in headnote 1, supra, and that Congress intended that it be classified as a "machine tool" rather than an office machine.

The definition, insofar as pertinent here, provides that the term "machine tool" means any machine used for shaping or surface-working metals, by changing the shape or form of the material without removing any of it. The embossing machine here does not cut away or remove any material, nor does it impart a new shape or form to the metal plate itself. What it does is to impress letters or other characters into a portion of the plate, so that one surface has slight protuberances and the other slight depressions. The question is whether this change is the kind of change in shape or form contemplated by Congress to bring a machine within the definition of machine tools in headnote 1.

Defendant emphasizes that portion of the definition covered by the words "changing its shape or form without removing any of it" and claims that, since the embossing operation changes the shape of the plate to some degree, the embossing machine is a machine tool. In our view, however, the definition must be considered as a whole and the terms "shaping or surface-working" given due weight. A statute must be construed as a whole and full force and effect given to all the language contained therein. Carey & Skinner, Inc. v. United States, 42 CCPA 86, 89, C.A.D. 576; Dart Export Corp. et al. v. United States, 43 CCPA 64, 71, C.A.D. 610; Charles Hardy, Inc. v. United States, 21 CCPA 173, T.D. 46509; Brier Mfg. Co. v. United States, 26 CCPA 195, C.A.D. 17. Moreover, tariff laws are drafted in the words and terms and vocabulary which are in use and are understood in the trade. United States v. Davies Co., 11 Ct.Cust.App. 392, T.D. 39317. They should receive a sensible construction, one which is in harmony with their purposes and which will avoid an unjust or absurd conclusion. Heide v. United States, 2 Ct.Cust.App. 399 T.D. 32166; Spencer Importing & Trading Co. v. United States, 2 Ct.Cust.App. 444, T.D. 32201; International Forwarding Co. v. United States, 16 Ct.Cust.App. 539, T.D. 43246.

The four witnesses who testified for the plaintiff herein, all of whom had had experience in buying, selling, or manufacturing office machines or machine tools or both, testified that the embossing machine is an office machine, bought and sold as part of a system of office equipment, and is not a machine tool, as that term is understood by those familiar with manufacturing and factory operations. We are particularly impressed with the testimony of Prescott A. Smith, who has engaged in manufacturing operations, has had charge of the machine tool laboratory at M. I. T. for many years, and, in addition to teaching and research, spends a substantial portion of his time as a consultant in the field of machine tools. He did not consider the embossing machine here a machine tool because it was not capable of producing parts for use in the construction of other machines or machine tools. Furthermore, his grouping of machine tools did not include any which are comparable to the embossing machine here involved.

Legislative history and the judicial construction of the term "machine tools" under previous tariff acts also lead to the conclusion that these embossing machines would not have been considered machine tools.

In a case arising under the Tariff Act of 1909, United States v. Georgia Pulp and Paper Manufacturing Co., 3 Ct.Cust. App. 410, T.D. 32998, the court held that, in view of the evidence presented as to commercial designation, a "machine tool" was one which worked metal and was capable of producing machines or parts thereof in a relatively finished condition.

Subsequent tariff acts define machine tool as "any machine operated by other than hand power which employs a tool for working on metal." (Paragraph 165, Tariff Act of 1913; paragraph 372, Tariff Act of 1922; paragraph 372, Tariff Act of 1930).

The Summary of Tariff Information 1921, which was before Congress when

the Tariff Act of 1922 was enacted, contains the following (p. 504):

    \*   \*   \*   The term "machine tools" has no very definite or fixed meaning. One class of power-driven machines is designed to produce a single type of article in great numbers with a considerable degree of automatic action, i. e. screw-making machines, bolt, threaders, nut tappers, gear cutters, and spring-making machines. These are styled "special" machines. They usually turn out a completed product or one requiring little subsequent finishing. The other class, properly called machine tools, consists of power-driven forming or shaping machines which are not special, but are adaptable for all kinds of work within their sphere on all shapes of metal stock or raw material. Machine tools are so defined in the act of 1913 as to include both the above classes.

    "Metal-working machinery" is a term applied to power-operated machines for working metals in the form of bars, rods, wire, plates, sheets, or casting, but excluding machines used in the production of the metal in the forms mentioned. \*   \*   \*

The Summary of Tariff Information, 1929 (pp. 812–813), describes machine tools as more or less massive apparatus for working metal and notes that typical basic machine tools are the lathe, the planer, the drilling machine and the grinding machine.

The summary on machine tools in Summaries of Tariff Information, 1948, volume 3, part 4, page 112, states that a distinction is made by the trade between machine tools proper, consisting of power-operated metal-working machines having one or more tools and workholding devices and used for progressively removing metal in the form of chips, and metal-working machines designed to shape metal by bending, pressing, and similar processes. It notes that machine tools are required in the production of practically all kinds of machinery and a multitude of other articles of metal. In the summary on metal-working machines

other than machine tools, ibid., page 120, it is stated that such machinery includes a large variety of industrial equipment, such as automatic hammers, various types of power presses, riveting machines, die-casting mashines, steel rolling machinery, swaging machines, and others.

In Benecke v. United States, 30 CCPA 55, C.A.D. 214, the court pointed out that the language in United States v. Georgia Pulp and Paper Manufacturing Co., supra, did not necessarily mean that all devices used in the metal-working art are machine tools.

In United States v. Kurt Orban Co., Inc., 47 CCPA 28, C.A.D. 724, a machine which compressed scrap metal, was held not to be a machine tool, although it did cut off protruding pieces of metal. The court noted that the primary function of machine tools was to perform an operation on metal in order to improve and advance its status, whereas the primary function of the baler was to compress scrap metal. In discussing the meaning of the term "work" in the definition in the Tariff Act of 1930, it stated (pp. 30–31):

    The word "work" is susceptible of such a wide variety of meaning that we have grave doubts Congress intended it to be construed as broadly as the Government urges. For example, in a broad sense any tool which changes the shape, size, or even the position of a piece of metal in any manner and for any purpose may be literally said to do "work" on it, even though the nature of that particular "work" be wholly incidental to the primary function of the device. Under such circumstances there is a substantial doubt in our mind that Congress intended that word to be given such a broad construction, and we think it proper to resolve that doubt in favor of the importer.

Other articles which have been held not to be machine tools are meat slicing machines (Gallagher & Ascher v. United States, 3 Ct.Cust.App. 520, T.D. 33168) and a secator used to cut metal by means of an oxy-acetylene flame (Keith Dun-

ham Co. v. United States, 26 CCPA 250, C.A.D. 24).

Articles which have been held to be machine tools include a sparking machine tool, used to knock off small particles of metal by means of sparks which jump between the gap between the tool and workpiece, which replaced a conventional machine tool (United States v. Gehrig Hoban & Co., Inc., et al., 52 CCPA 32, C.A.D. 853) and a machine for straightening crooked or bent round pipes or tubes, which improved and advanced the material for further use (Mannesmann-Meer, Inc. v. United States, 55 Cust.Ct. 1, C.D. 2546).

We turn now to a consideration of the language of headnote 1, supra, which originated with the Tariff Commission.

Under the Customs Classification Act of 1954, the Tariff Commission was directed to make a complete study of the customs laws in order to establish schedules of tariff classification which would be logical in arrangement and terminology and adapted to changes which had occurred since 1930, to eliminate anomalies and illogical results in tariff classifications, and to simplify the determination and application of such classifications. In the course of its study, the Tariff Commission reviewed a number of existing tariff, commodity, and industrial classification systems including "Nomenclature for the Classification of Goods in Customs Tariffs" (usually referred to as the "Brussels Nomenclature"), "Standard Industrial Classification Manual," "Standard International Trade Classifications," "Schedule A, Statistical Classification of Commodities Imported Into the United States," and "Schedule B, Statistical Classification of Domestic and Foreign Commodities Exported From the United States." It reported:

> * * * As a result of such study, a tentative outline of proposed schedules was developed which evolved into the outline of the schedules reproduced at the end of this report. The proposed arrangement is not exactly like any of the above mentioned classification systems, but an effort was made to incorporate as many desirable features of each of them as possible. The "Brussels Nomenclature" and the "Standard Industrial Classification Manual" exerted the greatest influence on the arrangement of the proposed revised schedules. * * * [Tariff Commission Study submitting report, November 15, 1960, p. 8.]

The "Brussels Nomenclature" provided for machine tools for working metal or metallic carbides (item 84.45); machine tools for working stone, ceramics, concrete, asbestos-cement and like mineral materials or for working glass in the cold (item 84.46); and machine tools for working wood, cork, bone, ebonite (vulcanite), hard artificial plastic materials or other hard carving materials (item 84.47). The explanatory note to item 84.45 provides:

> The machine-tools of this heading are machines used for shaping or surface-working metal or metallic carbides by either:
>
> (i) Cutting away or otherwise removing metal or metallic carbides (e. g., lathes, drilling, planing, slotting, milling or grinding machines). or (ii) Changing the shape or form of the metal without removing any of it (e. g., presses, hammers, wire-drawing machines). [Explanatory notes to the Brussels Nomenclature vol. 3, p. 880.]

Since this language is very similar to that in headnote 1, supra, it may be taken as evidence of the meaning intended by the Tariff Commission. The explanatory notes include a list of machine tools for changing the shape or form or metal without removing it. These include forging, stamping and die-stamping machines, metal-working presses, extruding presses, riveting machines, bending, trueing and straightening machines, swaging machines, drawing machines, plate or sheet working machines, shearing, punching, blanking and notching machines, wire-drawing machines, machines for working wire, thread rolling machines. This list does not include embossing machines. The metal-working presses referred to

are described as very powerful and operating by continuous pressure. (Explanatory Notes to the Brussels Nomenclature, vol. 3, pp. 881–882.)

The Standard Industrial Classification Manual of 1957 contains the following under metal-working machinery and equipment:

Establishments primarily engaged in manufacturing power driven machines, not supported in the hands of an operator while in use, for pressing, forging, hammering, extruding, shearing, bending or die casting metal into shape. This industry also includes rebuilding such machine tools and manufacturing repair parts for them. * * *

Prior to the adoption of the Tariff Schedules of the United States which contains the definition in issue here, the U. S. Tariff Commission prepared a Tariff Classification Study issued November 15, 1960, in which the headnote is discussed. The following appears in schedule 6, page 271:

Headnote 1 defines the term "machine tool" more broadly than it is defined in the present provisions of paragraph 372 where it is defined as "any machine operating by other than hand power which employs a tool for work on metal". Under the proposed definition, the term would apply not only to metal-working tools but also to machines used for shaping or surface-working stone, ceramics, concrete, asbestos, cement, and like mineral materials, glass in the cold, wood, cork, bone, hard rubber or plastics, or other hard materials. These latter machine tools are significant articles of trade and it is desirable to have a separate provision therefor in the proposed schedules.

At the hearings held on this section, one of the witnesses, George E. Long, counsel for Curt Arvin Co., stated that he believed that the definition in headnote 1 would include a baler, which merely cuts off excess scrap metal and requested that the definition of a "machine tool" in the Tariff Act of 1930 be retained since work on metal is well understood to mean fabrication and not mere haphazard cutting. Mr. Shewmaker, Assistant General Counsel of the United States Tariff Commission, replied that "we do not contemplate when we speak of a machine used for shaping or surface work, that we would be treating with anything such as a scrap baler." (Tariff Classification Study, schedule 6, pp. 648–649.)

It is clear that headnote 1 has broadened the meaning of the term "machine tool" for tariff purposes to the extent of including machines for shaping or surface-working materials other than metals. No evidence has been presented in this case in regard to such machines, but from the Explanatory Notes to the Brussels Nomenclature (vol. 3, pp. 883–885), it would appear that they are machines for cutting, sawing, polishing, grinding, or carving various materials.

Another significant factor is that the metal-working machine tools which are enumerated in items 674.30 and 674.32, TSUS, are of the type recognized by all the authorities as machine tools: Machine tools for cutting or hobbing gears and boring, drilling, and milling machines, including vertical turret lathes.

As to the term "shaping" in the headnote, we note that Audels Mechanical Dictionary (p. 491) defines it as follows:

The act of imparting form to an object either by bending or moulding to a given shape or by removing superfluous materials. * * * In machine shops, the term is applied to the machining of plane, concave or convex areas, by means of the *shaping machine.*

The same authority defines a "shaping machine" as "A straight line cutting machine for metal * * *" (p. 492). See also The New American Machinists' Handbook, pages 7–9; the Mechanical Engineers' Handbook, page 1777; Encyclopaedia Britannica, volume 14, page 580; Collier's Encyclopaedia, volume 12, page 649; Kent's Mechanical Engineers' Handbook, pages 23–43.

We have already noted that in Mr. Smith's experience the term "surface working" refers to polishing, buffing, or actual treatment of a surface.

None of the above operations are performed by the machine involved herein.

We conclude that when all the language referring to metal-working machine tools in subpart F, part 4, of Schedule 6, is considered as a whole, a construction which would result in holding the embossing machines before us to be machine tools would not be in harmony with the intent of Congress. It would not be in accord with the long-time meaning given to the term "machine tools" by those experienced in the field or by the authorities cited. We think it quite clear from the sources used by the Tariff Commission in drawing up the definition in headnote 1, the material in the Tariff Classification Study and the language of the subpart as a whole that there was no intention to so broaden the meaning of the term "machine tool" as to take in all machines which in any way change the shape or form of metal regardless of their capability of shaping or surface-working, as those terms are understood in the field, or of producing other machines or parts of machines, or of their being industrial equipment and regarded by those in the field as machine tools.

While the concept of "machine tools" generally may be changing and broadening, and the definition in headnote 1, supra, is broader than that in previous tariff acts, it would be a strained construction to hold the machine here, which is office equipment, a machine tool rather than an office machine. To hold it classifiable as an office machine is in accord with the common usage and with the definitions in subpart G, supra, and the background material to that subpart.

The embossing machine here is used in offices, together with other office equipment, in connection with the mailing of correspondence or keeping records or accounts, or doing other office work. It is used by clerks and typists and not machinists.

The definition of office machines in the "Brussels Nomenclature" is very similar to that in headnote 2a of subpart G of part 4, schedule 6, supra. It provides:

The term *"office machines"* is to be taken in a wide general sense to include all machines used in offices, shops, factories, workshops, schools, railway stations, hotels, etc., for doing "office work" (i. e., work concerning the writing, recording, sorting, filing, etc., of correspondence, documents, forms, records, accounts, etc.). * * *

The category covering addressing machines is described as follows:

These rapidly print addresses on invoices, letters, envelopes, etc.; they usually operate by means of a series of small card or metal stencils or embossed metal plates. The heading also covers special machines used for cutting the stencils or embossing the metal plates, and machines for selecting certain out of a number of address plates or stencils.

See also the article on addressing machines in Encyclopaedia Britannica, volume 16, page 715, which includes a description of embossing machines which prepare metal plates, and Encyclopedia Americana, volume 5, page 74, which includes embossing machines under business machines and equipment.

In a recent case, United States v. Mannesmann-Meer, Inc., C.A.D. 897, a complete manufacturing plant designed to manufacture welded tubes was held classifiable under paragraph 353 of the Tariff Act of 1930, as modified by T.D. 54108, under the provision for electrical welding apparatus, not specially provided for, rather than under the provision in said paragraph, as modified by T.D. 52739, as articles having as an essential feature an electrical element or device, not specially provided for, or under para-

414

graph 372, as modified by T.D. 51802, as machine tools.

In the course of the opinion the court said:

We deem it pertinent to here point out that the Congress, in enacting the Tariff Act of 1930, made specific provision in paragraph 353 for "electrical * * * welding * * * apparatus." The language employed in plain terms, and in the light of the factual situation here disclosed, snugly admits the importation under consideration, certainly far more so than the catch-all connotation inherent in "articles having as an essential feature an electrical element or device". (par. 353, as modified by T.D. 52739).

\* \* \* \* \* \*

While it is true that the subject importation is a device operated other than by hand power and employs tools or means for work upon metal, nevertheless it is also an "electrical * * * welding * * * apparatus," "instrument" or "device" specifically covered by the provisions of paragraph 353, as modified. We consider apposite to this issue the language employed in Davies, Turner & Co. v. United States, 9 Cust. Ct. 242, 245, C.D. 701, wherein it is stated:

The evidence is uncontradicted that the instant machine is essentially an electrical welding machine, its other function of shaping or forming metal being incidental to that of welding the shaped metal into tubing, which is the primary purpose for which the machine was constructed and designed.

In the instant case, the provision for office machines in item 676.30, TSUS, "snugly admits the importation under consideration," certainly far more than the provision for "Metal-working machine tools: * * * Other" in item 674.35.

The "not specially provided for" clause in item 676.30 is not controlling since that clause lessens the relative specificity of a provision only where the competing provisions are otherwise equally applicable. United States v. Snow's United States Sample Express Co., 6 Ct.Cust.App. 120, T.D. 35388; United States v. Alltransport Inc., 44 CCPA 149, C.A.D. 653.

Plaintiff's alternative claim that these embossing machines are classifiable as typewriters is untenable. Although some of the witnesses stated that there were similarities between an embosser and a typewriter, none of them said an embosser was a typewriter. By definition a typewriter is—

1. Any of various instruments or machines for writing in characters similar to those produced by printers' types. In the prevailing designs the characters are produced by striking the paper through an inked ribbon by steel types, the latter being actuated by corresponding keys on a keyboard. * * * [Webster's New International Dictionary, 1953 edition.]

See also the definition in the Explanatory Notes to the Brussels Nomenclature. It is stated there also:

* * * It should be noted that the stencils used on addressing machines or for marking packing cases are cut on special machines quite distinct from typewriters. * * *

In view of all the foregoing, we hold that the embossing machines involved herein are properly dutiable at 10 per centum ad valorem under item 676.30, TSUS, as office machines not specially provided for. To that extent the protest is sustained. As to all other claims it is overruled. Judgment will be entered accordingly.

RAO, C. J., and FORD, J., concur.