(C.D. 4061)

BORDER BROKERAGE COMPANY, INC. v. UNITED STATES

United States Customs Court, Second Division

(Decided August 12, 1970)

*Glad & Tuttle* (*George R. Tuttle, Jr.,* and *Robert Glenn White* of counsel) for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Steven R. Sosnov* and *John A. Winters,* trial attorneys), for the defendant.

Before RAO, FORD, and LANDIS, Judges

LANDIS, Judge: This protest involves the customs classification of a Minitron spark erosion machine incident to assessing duty under

the Tariff Schedules of the United States (TSUS). The machine was imported from Canada in January 1966.

Plaintiff claims the machine should be assessed with duty at 10.5 per centum ad valorem under TSUS item 683.95 which *inter alia* classifies electric welding, brazing, and soldering machines and similar articles for cutting. Alternatively, plaintiff claims the machine should be classified as an electrical article, not specially provided for, dutiable at 11.5 per centum ad valorem under TSUS item 688.40 or, as a machine, not specially provided for, dutiable at 10 per centum ad valorem under TSUS item 678.50. Plaintiff has briefed, in chief, the claim under TSUS item 683.95.

Customs classified the Minitron machine as a machine tool for working on metal, dutiable at 15 per centum ad valorem, under TSUS item 674.35. That classification, to all intents and purposes, follows the decision in *United States* v. *Gehrig Hoban & Co., Inc., et al.*, 52 CCPA 32, C.A.D. 853 (1965), which, in reversing the decision of the majority in this court, *Id.* v. *Id.*, 51 Cust. Ct. 81, C.D. 2414 (1963), held a "Sparking Machine Tool Eleroda D.1.", imported under the 1930 Tariff Act, properly dutiable as a machine tool for working on metal under paragraph 372, as modified, rather than as an article having as an essential feature an electrical element or device under paragraph 353, as modified. TSUS item 674.35 classifies machine tools previously provided for in paragraph 372 of the 1930 Act, but defines the term "machine tool" more broadly than it was in paragraph 372 so as to include machines for shaping or surface working other mineral materials, as well as metals.[1] Plaintiff would have us distinguish this case from the *Gehrig Hoban* case on the facts and the general purpose and intent of Congress when it enacted TSUS and, prefaced by headnotes to assist classification, provided for the disputed classification in schedule 6, parts 4 and 5 of TSUS as follows:

SCHEDULE 6. – METALS AND METAL PRODUCTS

PART 4. – MACHINERY AND MECHANICAL EQUIPMENT

Part 4 headnotes:

   1. This part does not cover—

     \*       \*       \*       \*       \*       \*       \*

    (v)  articles and parts of articles specifically provided for elsewhere in the schedules.

     \*       \*       \*       \*       \*       \*       \*

SUBPART F. – MACHINES FOR WORKING METAL, STONE, AND OTHER MATERIALS

---

[1] Tariff Classification Study (hereinafter TCS), Schedule 6, page 271.

Subpart F headnotes:

1. For the purposes of this subpart—
(a) the term "machine tool" means any machine used for shaping or surface-working—
(i) metals (including metallic carbides);
(ii) stone, ceramics, concrete, asbestos-cement and like mineral materials, or glass in the cold; or
(iii) wood, cork, bone, hard rubber or plastics, or other hard materials, whether by cutting away or otherwise removing the material or by changing its shape or form without removing any of it, but does not include rolling mills (item 674.20) or the hand-directed or -controlled tools provided for in items 674.60 and 674.70 of this subpart and in item 683.20 of part 5 of this schedule; * * *

\* \* \* \* \* \* \*

Machine tools:
Metal-working machine tools:

| | | |
|---|---|---|
| 674.30 | Machine tools for cutting or hobbing gears _____ | * * * |
| 674.32 | Boring, drilling, and milling machines, including vertical turret lathes _____ | * * * |
| 674.35 | Other _____ | 15% ad val. |

\* \* \* \* \* \* \*

PART 5.— ELECTRICAL MACHINERY AND EQUIPMENT

Part 5 headnotes:

1. This part does not cover—

\* \* \* \* \* \* \*

(v) washing machines, ironing machines, sewing machines, and other machines provided for in parts 4 or 6 of this schedule; * * *

\* \* \* \* \* \* \*

Industrial and laboratory electric furnaces and ovens; electric induction ad dielectric heating equipment; electric welding, brazing, and soldering machines and apparatus and similar articles for cutting, and parts thereof:

| | | |
|---|---|---|
| 683.90 | Welding machines and apparatus, and parts thereof_____ | * * * |
| 683.95 | Other _____ | 10.5% ad val. |

On trial, Mr. Whitfield M. Stuart testified for plaintiff. He is president of Carbitron Development, Ltd., Vancouver, British Columbia, the firm which apparently manufactured the Minitron machine and sold it to Carbitron of America, Inc., Bellingham, Washington, for shipment to Cutter Laboratories, Inc., Berkeley, California. Plaintiff, a customhouse broker, doing business in Blaine, Washington, serviced the customs entry at Blaine. Sales brochures of Carbitron, Ltd., with pictures and printed material relating to the Minitron machine complete the evidence. (Exhibits 1 and A.)

At best, it is difficult to describe a machine and how it operates in words. Visualize an instrument panel, clothes washer dryer. In general form, that is what the Minitron machine pictured in the exhibits looks like. The machine takes up a floor area 30″ x 30″. It is 51″ in height. The instrument panel has the usual mysterious looking knob controls, the marks of new technology. There the resemblance referred to ends.

Mounted on the counter in front of the instrument panel is a fixed carriage with two parallel bars. A saddle of sorts is locked to the bars and tool working machinery (Mr. Stuart called it "a work holding device") is mounted on the saddle which slides on the carriage bars so that the tool can be positioned across the metal piece to be worked. The tool can also be raised and lowered, by a built-in electro-hydraulic servo, into the entrails of the machine which consists of a large work tank that is filled with dielectric oil when the machine is in operation. A transformer is built into the "back" of the machine. (R. 8.)

Mr. Stuart testified that the metal piece to be worked:

> * * * is held in a tank, at the bottom of which is a holding plate for positioning the work. The purpose of the tank is that it can contain an insulating oil, and so control an environment and provide a method of removing the attrited metal. Above this, normally, is a work-holding device which is actuated by a servo-mechanism so that as the metal is removed the electrode is continually lowered into the work piece. In this way cavities and holes itself can be produced. [R. 7.]

The work-holding device or tool constitutes what Mr. Stuart called an electrode quill holder. The quill holder looks like a hollow shaft. Mr. Stuart also testified that an electrode, made from graphite or other conductor material for each individual job, is shaped in the form of the hole or cavity to be cut out of the metal (R. 7); that the metal piece to be worked is placed in the tank beneath the positioned electrode and the electrode, held by the quill holder, is lowered into the tank above it; that when the machine is turned on a pulsating current is applied across the electrode; that after the metal piece is cut to a preset depth, the machine shuts off automatically, and that the Minitron machine uses a high density direct current pulse to remove the

metal rather than a tool as such. The shape of the pulse emitted by the electrode determines the efficiency and the finish of the surface from which the metal is removed and Mr. Stuart explained that:

> The pulse removes the metal by first striking like a bolt of lightening. Originally, a tiny shaft of molten metal forms, the discharge spreads, the metal surrounding the original spark is plasticized. By this time the original discharge point is vaporized so quickly that it can explode and blast the plasticized metal into the oil, from where it is then carried away from the work by the oil. [R. 6.]

Mr. Stuart amplified the above with testimony that the metal is removed as very tiny spherical particles "anywhere from half a micron to about ten-thousandths in diameter, the result of condensation of the metal from the oil" (R. 10); that nothing physically touches the metal; that a discharge of electrons passes over a gap anywhere from half a thousandth to twenty-thousandths of an inch between the electrode and the work piece; that the discharge of electrons attacks the point closest to the electrode, and then moves on to the next closest point, back and forth, until all the metal is removed in the correct form of the electrode.

Exhibit A contains printed material which states that the Minitron machine is able to perform, with ease and economy without sacrificing accuracy, the following operations:

> 1. It will shape and pierce any electrically conductive material—"hard" or "soft", metal or metal carbide. 2. It will pierce any profile of hole. 3. It will sink cavities in forging dies, plastic molding, diecasting dies or permanent molds. 4. It will cut punch press dies, casting and forging trim dies. 5. It will make steel stamps, punches, form tools for lathe, milling machine or shaper. 6. It will sharpen carbide tools and cutters.

On cross-examination, Mr. Stuart stated that the Minitron machine does not join pieces of metal as do welding, brazing, and soldering machines.

Judge Smith, in his opinion written for the court of appeals, described the Eleroda D.1. machine in *United States* v. *Gehrig Hoban & Co., Inc., et al., supra*, as:

> * * * a unique type of machine designed for metal working. The metal to be worked acts as an electrode, as does the "tool" of the machine. When a voltage is impressed between the tool and the workpiece, a rapid and intermittent spark jumps the gap therebetween.
>
> Although the precise mechanism of metal removal is apparently not fully understood, it seems that the spark knocks off small particles (of the order of several microns in diameter) of metal from the workpiece. During operation, a dielectric fluid is pumped

around and between the tool and the workpiece to remove the metal globules and cool the work.

The testimony indicates that the tool itself never touches the work, the gap always remaining of the order of a few thousandths of an inch. The tool is shaped according to the conformation of the work to be done on the workpiece, and has two portions. One part, which is undersized, is used to "rough out" the work; the other is used for precision finishing. [52 CCPA 32, 33.]

The Minitron machine tool in this case operates substantially the same as the Eleroda D.1. tool described by Judge Smith above. On authority of *Gehrig Hoban*, this Minitron machine is also, therefore, a machine tool under TSUS item 674.35. Plaintiff, to escape that result, argues that the *Keith Dunham Co.* v. *United States*, 26 CCPA 250, C.A.D. 24 (1938), holding that a motor driven oxy-acetylene torch, capable of propelling itself along a predetermined course as it cut a metal plate or sheet, was not a machine tool, is still the controlling law. *Gehrig Hoban*, according to plaintiff, turned away from *Keith Dunham* on evidence that the Eleroda sparking machine performed the same function as conventional machine tools. There is, of course, no testimonial evidence here that the imported Minitron does or does not compete with conventional machine tools. But the operations which the Minitron machine can carry out on metal, vividly pictured and described in exhibits 1 and A, are all operations which conventional machine tools perform on metal. There is no evidence to the contrary, and there remains the presumption that the Minitron does compete with conventional machine tools. *E. I. du Pont de Nemours & Co.* v. *United States*, 27 CCPA 146, 149, C.A.D. 75 (1939).

For plaintiff to escape the result in *Gehrig Hoban, supra*, it must perforce prove that, under TSUS, this imported Minitron is more specifically provided for in TSUS item 683.95 than in item 674.35. The testimony and exhibits offer no objective standards for making that determination. Compare, *Pitney-Bowes Inc.* v. *United States*, 59 Cust. Ct. 181, C.D. 3116, 273 F. Supp. 403 (1967). Since the proofs also do not show that the imported Minitron meets the rather muted objective standard we discern in the legislative history for classification under TSUS item 683.95, we overrule the protest.

In the legislative history of schedule 6, part 5, we are told that part 5 "covers electrical machinery and equipment" and are asked to note that, "insofar as electrical machines are concerned, * * * part [5] covers only those which are specifically provided for * * * [in part 5] and that other electrical machines are classifiable in various provisions of parts 4 and 6 of * * * schedule [6] and in certain parts of schedule 7." [2] In this connection, plaintiff contends that the electrical

---

[2] Tariff Classification Study, schedule 6, part 5, page 302.

machines embraced within part 5 of schedule 6 are more specifically provided for than are the electrical machines in part 4 of schedule 6. The difficulty is that this provision for electric welding, brazing, and soldering machines and apparatus and *similar articles for cutting* in schedule 6, part 5 TSUS item 683.95, when limited to the merchandise before us, is not that all specific. Mr. Stuart testified that the Minitron is not an electric welding, brazing, or soldering machine. The related classification of "similar articles for cutting", under which plaintiff claims, contains no objective standard for determining what those are. Cutting yes, but the definition of "machine tool" in headnote 1(a)(iii), *supra*, also includes electrical machine tools that cut away the material. That contradiction makes cutting a tenuous standard for determining the relative specificity of TSUS items 674.35 and 683.95 in classifying electrical machines that cut.

The legislative history next tells us, relevant to the TSUS item 683.95 claimed by plaintiff, that "items 683.90 and 683.95 provide for certain industrial and laboratory *electro-thermic machines, apparatus and appliances in which the heat is obtained electrically*" [emphasis added].[3] The word "thermic" relates to heat and electro-thermic connotes heat which has as its source electricity. "Welding", "brazing", and "soldering" are all jobs done by application of heat to metal. Funk & Wagnalls Standard Dictionary, International Edition, 1963. In the technical sources we have researched, "electric-spark machining" is identified as a "metal-removal process in which materials that conduct electricity can be removed by an electric spark"; "thermal cutting" is discussed to include that which utilizes an electric arc to heat the metal to be cut. (McGraw-Hill Encylopedia of Science and Technology, Vol. 4, page 461 (electric-discharge machining); Vol. 14, page 469 (thermal cutting).) To go a bit further, the American Welding Society defines oxygen cutting as:

> * * * "A group of cutting processes wherein the severing of metals is effected by means of chemical reaction of oxygen with the base metal at elevated temperatures. In the case of oxidation-resistant metals the reaction is facilitated by use of a flux." Again, the general term covers specific processes: oxyacetylene cutting, oxyhydrogen cutting, etc., and in fact, any combination of a source of preheating with oxygen for the purpose of severing metals. *Even the electric arc as a source of preheating* is covered by this definition. [McGraw-Hill, The New American Machinist's Handbook (1955), page 21–2, emphasis added.]

Although an electric spark discharge and an electric arc appear to operate on the same principle of electrodes, we conclude that there is a distinction between an electrical machining tool which cuts utilizing

---

[3] Tariff Classification Study, schedule 6, part 5, page 304.

an electric spark and electrical machinery which cuts utilizing an electric arc to preheat the metal to be cut. It is that distinction which we discern the legislative reference to electro-thermic machines intended to preserve.

Plaintiff having failed to make a record upon which we can further objectively weigh those distinctions, the protest claims under TSUS items 683.95, 688.40, and 678.50 are overruled for failure to overcome the presumption that customs correctly classified the machine under TSUS item 674.35.

Judgment will enter accordingly.