**J. E. BERNARD & CO., Inc.**

v.

**UNITED STATES.**

**C.D. 3372; Protest No. 66/78389–242.**

United States Customs Court,
Second Division.

March 26, 1968.

Schwartz & Lidstrom, Chicago, Ill., (Barnes, Richardson & Colburn, New York City, and Joseph Schwartz, Chicago, Ill., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen., (Irving A. Mandel and Owen J. Rader, New York City, trial attorneys), for defendant.

Before RAO, FORD and BECKWORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in this case is described on the invoice as "PEM Water Fountain Nozzles made out of brass & bronze." Five items are listed: PEM #11A Fountainheads; PEM #11B Fountainheads; PEM #643 Aerating Jets; PEM #2001-A½" Adapter; and PEM #33–2 Cluster Jet. The merchandise was imported from Canada and entered at the port of Chicago on June 15, 1964. It was assessed with duty at 1.275 cents per pound and 15 per centum ad valorem under item 657.35 of the Tariff Schedules of the United States, as articles of copper, not coated or plated with precious metal, other. It is claimed to be dutiable at 10 per centum ad valorem under item 662.50 as mechanical appliances for spraying liquids and parts thereof, other.

The pertinent provisions of the Tariff Schedules of the United States are as follows:

Articles of copper, not coated or plated with precious metal:

\*    \*    \*    \*    \*    \*

Item 657.35  Other ..........................1.275¢ per lb. + 15% ad val.

Mechanical appliances, whether or not hand operated, for projecting, dispersing, or spraying liquids or powders; fire extinguishers, whether or not charged; spray guns and similar appliances; steam- or sand-blasting machines and similar jet projecting machines; all the foregoing (except automatic vending machines) and parts thereof:

Item 662.35    Simple piston pump sprays, powder bellows, all the foregoing and parts thereof ......................19% ad val.

Item 662.40    Sand-blasting machines, and parts thereof ......................Free

Item 662.45    Sprayers, self-contained, having a capacity over 5 gallons, suitable for agricultural or horticultural use ..........................Free

Item 662.50      Other ......................10% ad val.

At the trial, plaintiff called Peter Micha, president of Imperial Irrigation Company, Ltd., which corporation and its predecessor was and is in the business of manufacturing water fountain equipment for decorative water displays. It also acts as a contractor for irrigation systems, such as lawn sprinkler systems, and other watering projects. The duties of the witness include sales, supervision of contracts, supervision of manufactured goods on order, and supervision of shipping. He was familiar with the articles involved in this case.

Samples of three of the items, #11A Fountainheads, #643 Aerating Jets, and #2001A Adapter were received in evidence as exhibits 1, 2, and 3, respectively. Mr. Micha testified that they were made out of cast bronze, or brass bar stock, in a machine shop on a lathe. He was familiar with the manner of their use in the United States and had seen them in actual use.

Exhibit 1 is a fountainhead consisting of several parts. The cap is a circular piece having one orifice in the center and two rings of orifices surrounding it. It screws into a metal body or cup within which are two cylindrical pieces, apparently of plastic, with orifices on the sides. The witness said that the fountainhead is mounted on a small submersible pump, as produced by several American manufacturers, and the entire unit is placed in a small fountain bowl or garden pool. In use, it creates a decorative effect, illustrated in the 1967 PEM Fountain Equipment catalog (exhibit 4). This shows a three-tiered water display, consisting of a single jet in the center and two lower spray effects. The witness said that the devices in the fountainhead create a pressure differential between the three types of orifices. The center jet has full pressure and sprays highest. The first ring of orifices has approximately 75 percent of the pressure, while the outside ring has only 40 percent of the pressure, thereby creating different spray heights. These various pressure effects are regulated by the items which are inside the nozzle. These items do not move during the process of building up pressure and dispersing water.

According to the witness, the fountainhead designated as 11B is identical with 11A except for the size of the orifices. It has a larger and heavier spray pattern. It was originally designed for a larger size submersible pump.

Plaintiff's exhibit 2, the aerating jet, is a metal cylindrical object about 7 inches long consisting of several parts. The witness explained its use as follows:

\* \* \* This type of fountain jet is used to create a heavy foam, a white column appearing water. The jet is installed partly submerged into the water. A suction is created, a vortex is created by the nozzle, by the nozzle of the jet, which is in the lower part of the jet. This vortex draws in water from the pool through the slots; also it draws in air from the atmosphere, and the jet produces a foam-like effect to approximately seven times the volume as ejected by the nozzle. This type of jet is used to create water displays in fountains that require greater attraction.

By means of this device, a column of water 6 or 8 feet in height is produced. The item belongs to a whole group of jets made in sizes up to and including 18-inch spray diameter, with a spray height of over 100 feet. The jet can be adjusted by screwing the outer cylinder up or down, limiting either the entry of water into the jet, or the entry of air into the jet chamber. It could be done while the jet is in operation.

Exhibit 3 is a small metal object, cylindrical in shape, tapering to a ¼ inch diameter. The witness said it is used for small submersible pumps to create a stream of water, spray effect, in small garden fountains.

The remaining item, #33–2, cluster jet, is illustrated on page 4 of the PEM catalog. The witness said it was similar in appearance to number 11A except that the metal cap had one ring of orifices.

The witness stated that with each of these nozzles, a pump creates the pressure with which the nozzle operates and also serves to recirculate the water in the fountain so that it may be reused over and over again. Water has to be injected into these nozzles so that they can disperse it. The nozzles are usually connected with the pumps by pipe fittings, but in some instances the fountainhead connects directly with the pump. There is no use for the nozzles except with fountains.

Mr. Micha testified that his firm does not install fountainheads but at times renders design suggestions to its distributors. It does not sell corresponding pumps with the nozzles. However, to his knowledge the nozzles could not be used without pumps because the pressure normally found in water supply systems would not be stable and because of health code requirements. He said that, while it would be possible to connect a nozzle directly to a plumbing system omitting a supplemental pump, it would function only for a very short time. It might be done with the number 11A spray head if one had a water disposal system. He had never in fact seen a nozzle used in the United States without a pump.

When asked whether in his opinion the operation of the nozzles alters one form of energy into another, the witness stated:

* * * The transformation from one energy into another, for example, takes place in a pump, where electrical energy is transformed into water pressure, into energy contained within water pressure, which water pressure then is used to be dispersed by my spray equipment. There could be the possibility that due to gravitational laws, the influx of atmospheric pressure, and the exit of water pressure in one of our aerating jets, a change, or change of energy may take place, which could be very minute. * * *

* * * * * *

Obviously our devices must transmit energy, because pressure at a certain pressure rating enters the nozzle through an internal process; within the nozzle you have a pressure differential at the other end of the nozzle, so that you have a transmittance of pressure, a change of pressure within the nozzle. Once the spray leaves the orifice, it attains a velocity rating where pressure is transmitted, or translated, or exchanged into velocity, which velocity is based on the laws of air resistance, also of gravitational pull, and again, I am not familiar with the physical laws of this matter.

In the opinion of the witness, the jets and nozzles create motion.

Plaintiff's second witness was W. S. Arthur, chairman of the board and chief executive officer of Garden Supply and Specialties Corp., the importer herein. It designs, supervises, and installs decorative fountain kits and custom fountain kits. His firm takes nozzles, such as those involved herein, and puts them up into complete decorative fountain kits. Such kits consist of a nozzle, a manifold with a valve and pump, either submersible type, or dry type pump, underwater lighting, and junction box. The firm's sales catalog lists a group of custom fountains that it has designed, plus a group of fountain kits, and fountain accessories, such as underwater lighting, which it manufactures. Pages of the catalog describing fountain kits including nozzles of the type here involved were received in evidence as exhibit 5. For example, the one using nozzle 11A consists of—

Bronze Water Castle spray head
300 watt bronze fountain light with amber lens * * *
¼ H.P. bronze submersible pump and motor with remote starter box
Perforated brass suction screen
Bronze regulating valve
Bronze junction box with 2 water seals in sides and ¾″ N.P.T. in bottom
All copper manifolding and piping furnished complete ready to assemble
Complete piping and electrical blueprints

Mr. Arthur testified that his firm sells these kits as complete design kits to wholesalers and that it supervises the installation. They would have no commercial use without the nozzles because there would be no decorative effect, just water going up in the air. As far as he knows, there is no use for the nozzles other than as parts of these fountain kits.

In the course of his experience, the witness has seen thousands of fountains, all of them with pumps. In his opinion, it would not be feasible to use fountain equipment without pumps because of the expense, because the pressure of city water continually changes, and because of local city health codes.

His firm would not sell nozzles as replacement parts unless it knew the size of the pump, how much pressure was available, and how many gallons of water per minute were available with the existing pump. He did not recall ever being asked to supply a nozzle for a pump designed by some other individual, where the originally installed nozzle was no longer functioning.

Plaintiff claims that these articles are mechanical appliances for spraying liquids, or parts thereof. The question before us is whether they are fairly encompassed within that description.

The following definitions of the words "appliance" and "mechanical," some of which were quoted by the parties, are pertinent to the resolution of the issue:

*appliance*

Webster's Third New International Dictionary, 1963 ed.:

* * * the act of applying or using * * * 2: something applied to a purpose or use * * * b: a piece of equipment for adapting a tool or machine to a special purpose * * * c: a tool, instrument or device specially designed for a particular use.

Funk and Wagnall's New Standard Dictionary of the English Language, 1956 ed.:

* * * 1. Anything through or by which something is effected or accomplished, or which appertains or is essential to the conduct, course, or operation of a particular thing * * * 2: The act of applying, putting to use, or carrying into operation; application; as the *appliance* of a principal. * * * Syn: agency, arrangement, contrivance, instrument, machine, means, mechanism, tool.

Dictionary of Technical Terms, 1957:

A general term used in speaking of household electric laborsaving devices, such as toasters, mixers, sweepers, etc.

Reader's Digest Great Encyclopedic Dictionary, 1966:

1. A device or instrument; especially, an electrically powered device for household work, as a washer, vacuum cleaner, etc. 2. The act of applying; application.

*mechanical*

Webster's Third New International Dictionary, 1963 ed.:

* * * of, relating to, or concerned with machinery or tools * * * produced or operated by a machine or tool * * * b: of or relating to manual operations * * * 6: AUTOMATIC.

Funk & Wagnall's New Standard Dictionary, 1956 ed.:

* * * 1. relating to or of the nature of mechanics or mechanism; * * * 2. produced by machine or machinery; * * * 3. resulting from the employment of mechanism; operated by machinery * * *.

Reader's Digest Great Encyclopedic Dictionary, 1966:

1. Of, involving, or having to do with the construction, operation, design, etc., of machinery or tools: a *mechanical* engineer. 2. Operated or produced by a machine. 3. Of, pertaining to, or in accordance with the science of mechanics. 4. Made or performed as if by a machine; * *.

■ It appears from these definitions that the term "appliance" is a broad one

encompassing tools, instruments, devices, contrivances, machines, mechanisms, and almost anything applied for a particular purpose. However, when coupled with the adjective "mechanical," it cannot mean everything that is applied or used but must be limited to items which employ mechanical means. Whether or not the term has precisely the same meaning as the word "machine," it must denote an article closely akin to a machine. In fact, both parties have cited cases under previous tariff acts involving machines.

To determine what the Tariff Schedules of the United States mean by the term "mechanical appliances," we turn to the Tariff Classification Study of November 15, 1960, which was prepared prior to the adoption of the tariff schedules. It states (schedule 6, part 4, page 264):

> Items 662.35 through 662.50 are under a superior heading for mechanical appliances for projecting, dispersing, or spraying liquids or powders; fire extinguishers; spray guns and similar appliances; steam or sand-blasting machines and similar jet-projecting machines. Item 662.35 covers simple piston pump sprays, powder bellows and lawn sprinklers at the rate of 19 percent ad valorem which is the rate currently applied to such articles under paragraph 397. Item 662.40 provides for the free entry of sand blast machines which are presently free of duty under paragraph 1643. Item 662.45 would provide more realistically for certain sprayers presently classified as agricultural implements under paragraph 1604. Item 662.50 reflects the rate of 12.5 percent ad valorem which is the approximate arithmetical average of the rates currently applied to the articles covered thereby under paragraphs 353 and 372.

■ Paragraph 353 of the 1930 Act covers, *inter alia*, articles having as an essential feature an electrical element and paragraph 372 covers machines. The quoted material is, therefore, an indication that the type of merchandise item 662.50 was intended to encompass was in the nature of a machine or an electrical device.

■ The superior heading to item 662.50 has been taken verbatim from the "Nomenclature for the Classification of Goods in Customs Tariffs" (usually referred to as the "Brussels Nomenclature"), which was used by the Tariff Commission in the preparation of the Tariff Schedules of the United States. Therefore, the meaning of the language in the Brussels Nomenclature may be taken as evidence of the meaning intended by the Tariff Commission. Pitney Bowes, Inc. v. United States, 59 Cust.Ct., C.D. 3116, appeal dismissed December 26, 1967.

In the explanatory notes under that item (vol. III, pp. 808–810), it is stated that the heading covers 4 main groups of machines: (A) Syringes, sprays and powder distributors, (B) Self-contained fire extinguishing appliances, (C) Spray guns and the like, and (D) Sand or steam blasting machines and the like. Under (A) it is stated:

> Provided that they incorporate mechanical devices for producing or dispersing the spray or jet, or for automatically orientating the spray head (including simple mechanisms activated by water pressure), the heading includes the following types of appliances, whether fixed, transportable or mobile:
>
> (1) Sprinklers and sprays for lawns, orchards, etc. (e. g., rotary sprays and oscillating sprays).
>
> (2) Hydraulic guns designed for dislodging minerals (e. g., gold bearing sands) from mountain sides, etc., by projecting powerful jets of water.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The heading does not include:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (b) Hose pipe nozzles (Section XV, or heading 84.61 if fitted with taps, cocks, valves or other appliances for regulating the liquid flow).

The nozzles before the court are not hose pipe nozzles. They have no operating parts which move and do not incorporate mechanical devices for producing or dispersing the spray or jet. Plaintiff's exhibit 2, the aerating jet, does have an adjusting screw but it does not move during the operation of the nozzle. Such an article is not a "machine." United States v. J. E. Bernard & Co., Inc., 30 CCPA 213, C.A.D. 235. In that case, under the Tariff Act of 1930, the court held that a machine such as Congress had in mind must have some movable parts, and must do some of the things pointed out in Simon, Buhler & Baumann (Inc.) v. United States, 8 Ct. Cust.Appls. 273, T.D. 37537, that is, utilize, apply, or modify energy or force, or transmit motion.

In the instant case, water has to be injected into the nozzle under pressure supplied by pumps and the inner construction of the nozzle causes the water to be dispersed in a certain way—as jet or spray and to different heights. According to the witness, transformation of energy takes place in the pump, not the nozzle. While he stated that a change of pressure takes place within the nozzle, it appears rather that the pressure itself was not changed but that in exhibit 1, for example, the arrangement of the nozzle or the orifices therein caused some of the water to exit at full pressure and the balance at less than that. It is evident also that the suction and vortex referred to in the witness' testimony in regard to exhibit 2, supra, are created only in conjunction with the action of the pump.

Plaintiff relies on Durst Mfg. Co., Inc. v. United States, 50 CCPA 56, C.A.D. 820. That case involved sprinkler tops for rotary lawn sprinklers. It was conceded that they were parts of lawn sprinklers for tariff purposes, the only question being whether the lawn sprinklers themselves were machines. The court described their mode of operation as follows (p. 58):

These sprinklers all operate in precisely the same manner, once the adjustable nozzles, on those having such nozzles, have been set to spray in opposite directions. Water from a garden hose enters the horizontal passageway in the base and rises upwardly through the vertical passageway therein and through the vertical central leg portion of the rotary sprinkler top. It then flows outwardly through the two horizontal arms, making about a 90° turn as it leaves the arms through holes or nozzles. Assuming the adjustable nozzles to be set to squirt in approximately opposite directions at opposite ends of the arms, which is their principal use, the sprinkler top rotates so long as the water is turned on. The spinning of the top distributes the water spray in a well-known manner.

The court discussed the meaning of the term "machine" and quoted from Nord Light, Inc. v. United States, 49 CCPA 12, C.A.D. 786, as follows (p. 61):

A common meaning of the word "machine" found in the dictionaries which we referred to in the *IDL* case, supra, is a device which may be either simple or complex, whose function is to increase the intensity of an applied force, *or to change its direction, or to change one form of motion or energy into another form.* [Emphasis added.]

It concluded:

We think this meaning is clearly applicable to the lawn sprinklers before us. On the basis of the testimony, and in accord with commonly known principles of elementary physics, the energy in the moving stream of water is applied to the sprinkler head to cause it to rotate. The outward motion of the water from the nozzles produces, by reaction, rotary motion of the mechanical device. The rotary motion of the sprinkler acts, in turn, on the moving stream of water to distribute it over the desired circular area. The energy of the water is converted by the sprinkler into mechanical motion, making a small water motor out of the sprinkler head which does

useful work in distributing the water where it is wanted.

██ The court did not hold that the nozzles themselves were "machines" and we do not find that the nozzles in the instant case are themselves either machines or mechanical appliances for spraying liquids.

Plaintiff claims, however, that they are parts of such appliances, that is, parts of fountain assemblies which include pumps and other components. Even simple pumps have been held to be machines. Victoria Distributors, Inc. v. United States, 56 Cust.Ct. 284, C.D. 2639.

To resolve the issue, we must first determine whether the fountain assemblies are themselves mechanical appliances for projecting, dispersing, or spraying liquids. They comprise (in addition to the nozzles) pumps, lights, valves, piping, and other equipment, and are sold as kits ready for assembly and installation. When the equipment is assembled and installed, it operates mechanically by means of the pump, motor, valves, and other items. It serves the particular use, purpose, and function described in the superior heading to item 662.50, supra, namely, the projection, dispersal, and spraying of liquids.

██ The fact that the components of the fountains have not been assembled does not militate against their being considered an entity. John A. Steer & Co. v. United States, 24 CCPA 293, T.D. 48737. In that case, appellant imported several shipments of goods, which comprised, when assembled, a complete anhydrous ammonia plant. The court held that there could be no question but that the apparatus was a machine.

No cases have been called to our attention involving fountains and the only one at all pertinent which our independent research has found is Spaulding & Co. v. United States, 9 Treas.Dec. 598, T.D. 26247. The importation there was described as a marble fountain with electrical attachments. The whole was assessed with duty as a manufacture of marble. It was claimed that the mar-

ble portion was dutiable at a lower rate under a commercial agreement with France as "statuary." The court sustained this claim and also pointed out that the mechanism and accessories were erroneously assessed as manufactures of marble. In the course of the opinion, it used the terms "electrical apparatus," "appliances for throwing streams of water," and "mechanical apparatus," to refer to the portions of the fountain not made of marble. Evidently the court felt that these terms were more or less synonomous.

In the Tariff Schedules of the United States, the superior heading to items 662.35 to 662.50, and the items thereunder, include, *eo nomine*, fire extinguishers, spray guns, simple piston pump sprays, powder bellows, steam- and sandblasting machines, and sprayers, self-contained, having a capacity over 5 gallons. Some of these articles may be large and some small; some simple and some complex. The common thread which binds them together is that their purpose is to project, disperse, or spray liquids or powders. It appears from this that it was the intent of Congress to include within this heading and the items thereunder, a variety of mechanical spraying devices, appliances, and machines, unless otherwise more specifically provided for. This is also the intent of the Brussels Nomenclature, as is evident from the explanatory notes, supra.

██ We conclude that the fountains here involved are mechanical appliances for projecting, dispersing, or spraying liquids within the meaning of the tariff schedules.

██ Are the nozzles parts thereof? The uncontradicted evidence establishes that their only use is with other components to form fountains. While the testimony indicates that it might be possible theoretically to connect the nozzles directly with a city water supply system, it brings out that this would be impracticable and contrary to health codes, and was, in fact, never done. It is clear that

the nozzles could not be used for any practical purpose without pumps and other equipment and that without the nozzles the apparatus would not function for its intended purpose as a fountain. The nozzles are, therefore, parts of fountains, as the term "parts" has been construed under tariff statutes. United States v. Pompeo, 43 CCPA 9, C.A.D. 602; Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849.

As additional ground for this view, we note that the Explanatory Notes to the Brussels Nomenclature reveal an intent to include spray nozzles as parts of the mechanical appliances provided for in heading 84.21. In volume 3, page 810, it is stated:

PARTS.

*Subject* to the general provisions regarding the classification of parts (see General Explanatory Notes on Section XVI), the heading includes *parts* for the appliances and machines of this heading. Parts falling in this heading thus include, *inter alia*:—reservoirs for sprayers, spray nozzles, lances and turbulent sprayer heads *not of a kind described in heading 84.61.*

Heading 84.61 covers taps, cocks, valves, and similar appliances used in pipes, etc., to regulate the flow of liquids. In the explanatory notes it is said to include "hosepipe nozzles and the like fitted with cocks or with valves for forming a jet or a spray. But automatic sprinkler heads for anti-fire installations, automatic garden sprinkler heads and the like are excluded (heading 84.21)." Thus it appears to have been the intent of the Brussels Nomenclature to classify spray nozzles, as distinct from hosepipe nozzles, as parts of mechanical appliances for spraying liquids.

For the reasons stated, we hold that the spray nozzles involved herein are parts of fountains, which are mechanical appliances for projecting, dispersing, or spraying liquids, and are properly dutiable at 10 per centum ad valorem under item 662.50 of the Tariff Schedules of the United States, supra.

To that extent the protest is sustained. As to all other claims, it is overruled. Judgment will be entered accordingly.