**440**

W. R. FILBIN & CO., Inc., Plaintiff,

v.

UNITED STATES, Defendant.
C.D. 3897; Protest Nos. 67/49580–8468
and 67/49593–8467.

United States Customs Court,
Second Division.

Oct. 9, 1969.

Joe A. Walters, Minneapolis, Minn. (Thomas A. Keller, III, Minneapolis, Minn., of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Brian S. Goldstein, New York City, trial atty.), for defendant.

Before RAO, Chief Judge, and FORD and NEWMAN, Judges.

NEWMAN, Judge.

The issue to be decided in these two consolidated protests is the proper tariff classification of so-called "Crosby-Clip Bases." It appears that a "Crosby-Clip" is a wire rope clip, which is used to hold

together two pieces or two ends of wire rope. The imported articles, after completion in the United States, become a component part of such wire rope clips, viz., bases.

The merchandise (bases) was classified by the customs officials under the provision in item 657.20 of the Tariff Schedules of the United States (TSUS) for other articles of iron or steel, not coated or plated with precious metal, and accordingly was assessed with duty at the rate of 19 per centum ad valorem.

▇ Plaintiff claims that the imported bases are properly dutiable at the rate of 10.5 per centum ad valorem under the provision for forgings of iron or steel in item 608.25, TSUS. In its protest, plaintiff alternatively claimed that the articles are dutiable under item 649.37, TSUS, as clamps at the rate of 10.5 per

centum ad valorem. Although extensive testimony was adduced by plaintiff at the trial relative to its alternative claim, no argument is presented in its brief in support thereof. In point of fact, plaintiff's contentions are in derogation of its alternative claim in that it is argued that the articles are merely parts of clamps; and it is correctly pointed out that there is no specific provision in the tariff schedules for parts of clamps. Under these circumstances, I consider plaintiff's alternative claim as having been abandoned. Cf. Randolph Rand Corp., J. J. Boll v. United States, 52 Cust.Ct. 107, C.D. 2445 (1964), aff'd 53 CCPA 24, C.A.D. 871 (1966).

### THE STATUTES INVOLVED

The pertinent provisions of the Tariff Schedules of the United States read as follows:

*Classified under:*

Schedule 6, Part 3, Subpart G:

Articles of iron or steel, not coated or plated with precious metal:

\* \* \* \* \* \* \* \*

Other articles:

\* \* \* \* \* \* \* \*

657.20      Other ...............................19% ad val.

*Claimed under:*

Schedule 6, Part 2, Subpart B:

Forgings of iron or steel, not machined, not tooled, and not otherwise processed after forging:

608.25      Other than alloy iron or steel ...........10.5% ad val.

————◆————

### THE ISSUE

▇ Since "articles of iron or steel" include forgings of iron or steel, while the latter constitute but one of many varieties of "articles," the provision for forgings is more specific. Newman-Andrew Co. v. United States, 2 Ct.Cust. Appls. 4, T.D. 31570 (1911). Hence, the question for determination is whether plaintiff has established the applicability

of the provision for forgings in item 608.-25, TSUS to the imported merchandise. I hold that the articles involved herein are dutiable as claimed by plaintiff.

### THE FACTS

Initially, I shall briefly review the facts as established by the record.

Plaintiff called as its first witness Joseph Barone, the vice-president of the

manufacturing concern in Canada which had produced the merchandise. This witness had personally supervised the production of the articles and was personally familiar with the method of production. With the aid of photographs (plaintiff's illustrative exhibit 2), he explained the successive steps in the manufacturing operation which consisted of the following: Steel (non-alloy) bar stock of appropriate diameter was sheared into billet length and placed in a forging furnace to bring it to forging temperature (approximately 2400° F.). The hot billet was then placed, as quickly as possible, in a forging hammer which beat it into a platter-like configuration comprised of a "string of forgings" surrounded by flash.[1] While still at forging temperature, the platter was taken to a punch press where the "string of forgings" was punched out of the platter (leaving the flash), and simultaneously holes were punched in the articles. From the punch press the articles were transported by a conveyor to a metal box where they were allowed to cool. From the time the billet was originally heated to forging temperature, through the time that the forging dropped into the metal box, there was no appreciable drop in the temperature of the steel. After the articles cooled to room temperature in the metal boxes, they were transferred to wooden boxes for transportation to the United States. After forging, the articles were neither machined nor tooled. Samples of the imported articles were introduced in evidence as plaintiff's exhibit 1.

Plaintiff's second witness was Edward J. Crook, Jr., the chief engineer employed at the plant in the United States where the processing of the forgings was completed. From this witness' testimony, it appears that the merchandise was received at his plant in the condition of exhibit 1. It was then subjected to a process referred to as "shock blasting," for the purpose of removing forging scale and rough edges. Thereafter, the bases were hot-dip galvanized, cooled, and then assembled together with a U-bolt and hexagonal nuts to make wire rope clips. The manufacturing process was then finished. A sample of the completed wire rope clip was introduced in evidence as plaintiff's illustrative exhibit 3.

Defendant introduced the testimony of Stanley F. Thompson, the sales manager of a manufacturer of forgings. Through observation and education the witness had become familiar with drop forging, which he described as follows (R. 104–105):

Q. As far as the procedure of manufacturing forgings themselves, what are the steps—that you know?—A. During the forging operation?

Q. That is correct.—A. Well, you have, first, to prepare the proper length of steel to be used in the forgings that you are going to make in the die, and then you process the forging in the various impressions in the die until you make the finished impression. When you strike the final blow of the forging hammer, and the formation of the platter forgings, whether it be one or more than one, and in a line of forgings, you have performed the last hammer blow, and that's the last hammer operation that you have—and you go on from there to various other operations, such as trimming.

While the foregoing testimony is not as clear as it might have been, I conclude from further testimony of Mr. Thompson that the last hammer blow terminates the drop hammer procedure, but not the forging operation. The following colloquy

---

1. The term "flash," as applied to forgings, is a thin fin of metal formed at the sides of a forging where a small portion of metal has been forced out between the edges of the forging dies. Henderson's Metallurgical Dictionary (1953), page 137. However, in the instant case, the flash conformed to the die shape, since the dies were grooved for the flash (R. 25).

and testimony (R. 116) aids in clarifying the previous testimony of the witness:

> MR. GOLDSTEIN: Your honor, I believe this gentleman can testify concerning when the article is removed from the *dropped-hammer procedure*, if he has observed it, and this is what his testimony was, a moment ago. [Emphasis added.]

> JUDGE RICHARDSON: Objection overruled. He may answer.

> Q. At what point, sir, is the article removed from the *drop-hammer procedure*? [Emphasis added.]—A. The last operation performed is when the platter of forgings is finished in the hammer—the finished blow is struck—that is the end of the operation *involving the hammer*. [Emphasis added.]

> Q. Do you know what the next step concerned in this process [drop forging] is?—A. Normally, a trimming operation is performed as a next operation.

Consequently, I find that, following the drop hammer procedure, normally the next step in drop forging is a trimming operation.

## SUMMARY OF ARGUMENTS

Item 608.25 requires that the forgings classifiable thereunder be "not machined, not tooled, and not otherwise processed after forging." Plaintiff contends that the merchandise was produced exclusively by "forging processes." Defendant does not dispute that the articles were forged, but contends that the articles were "otherwise processed after forging" since the punching operation was separate and distinct from the forging process. Defendant emphasizes that the dies used for hammering were different from those used for punching. It is also strenuously argued that the instant merchandise is not the type of "rough forging" intended to be covered by item 608.25, TSUS, and defendant has extensively quoted in its brief from the Brussels Nomenclature and the Summaries of Trade and Tariff Information to buttress such contention.

## COMMON MEANING OF "FORGINGS"

To be classifiable under item 608.25, the imported articles must, of course, consist of "forgings." Hence, it is appropriate to first inquire into the common meaning of that term. It is well established that ascertaining common meaning is a question of law for the court's determination, and the court may refer to lexicographic and technical information. United States v. National Carloading Corp., James S. Baker Import Co., 48 CCPA 70, C.A.D. 767 (1961). Accordingly, I have noted the following descriptions of "forgings":

Henderson's Metallurgical Dictionary (1953), at page 141:

> A metal part made by a forging operation; metal that has been worked to some predetermined shape by a process of hammering, upetting, pressing, or rolling, either hot or cold, or by a combination of several of these operations. There are five principal types of commercial forgings: *drop forgings; upset forgings; press forgings; smith forgings; roll forgings*. These are produced, respectively, on the *drop forging hammer*, the *forging hammer*, the *forging machine*, the *forging press*, on the anvil in the blacksmiths' shop or on the *smith forging hammer*, and between *forging rolls*. While each of the five types has certain respective advantages, the Drop Forging Association has estimated that about one-half of the total tonnage of forgings produced annually in the United States are drop forgings. [Italics in original.]

—and—

American Society for Metals Metals Handbook, Volume 1, Eighth Edition (1961), at page 111:

> FORGING is the process of working hot metal between dies, usually under successive blows and sometimes by continuous squeezing. Closed-die forgings or "drop forgings", hot upset parts,

and extrusions are shaped within a cavity formed by the closed dies.

It is apparent from the above quoted descriptions of "forgings" and the authorities from which they were taken, that the tariff provision under consideration is a technical metallurgical term. In that connection, I have noted the following comments of our appellate court in Firth Sterling, Inc. v. United States, 48 CCPA 130, 136, C.A.D. 779 (1961):

> * * * we do not take it to be the function of the court to "define" technological terms in the tariff act but rather to construe and apply them on a case by case basis. We are often, as here, required to determine common meaning of technical terms in part on the basis of evidence supplied to us and the evidence in one case might lead to a different meaning than the evidence in another case. Equally important is the fact that the same term may mean different things in different contexts and we cannot undertake to "define" it for all purposes. * * * Perhaps we do "define" words like * * * ["and" or "such" or "similar"] which are lawyers' tools, but we do not attempt to "define" the words which are the tools of the chemist, the physicist, or the *metallurgist* in the sense of giving them a meaning which they will have in all contexts and under all circumstances. [Emphasis added.]

Thus, in accordance with the foregoing comments, I shall not undertake to define the term "forgings" for all purposes, but construe and apply it within the framework of the record before me, bearing in mind the descriptions set forth in the technical authorities alluded to above. Based upon the step by step explanation of plaintiff's first witness as to the method of producing the instant merchandise and the descriptions of forging in the *Metallurgical Dictionary* and *Metals Handbook*, I hold that the articles are forgings.

Defendant, however, argues that the articles are not the type of "rough forgings" intended to be covered by item 608.25. It is emphasized that "far from being crude recognisable [sic] shapes which require considerable further shaping in the forge or other shaping device, [the articles] are in their final form at the time of importation." Defendant points out that there is no difference between the shape of the imported clip bases as represented by exhibit 1, and the clip bases after final processing in the United States, as represented by exhibit 3.

In support of its argument, as observed above, defendant heavily relies upon the Explanatory Notes to the Brussels Nomenclature (hereafter referred to as the Explanatory Notes), Volume 2, Chapter 73, heading 73.07, pages 662–663 (1955), and the Summaries of Trade and Tariff Information (hereafter referred to as Summaries), Schedule 6, Volume 4, pages 91–97 (1967). Briefly stated, the forgings in item 608.25 and the pieces roughly shaped by forging in heading 73.07 of Brussels are described in those publications as semi-finished products of rough appearance which require considerable further shaping. A comparison of the shapes of exhibit 1 and the bases in exhibit 3 clearly shows that the imported articles did not require considerable further shaping; and hence they do not conform to the descriptions in the Explanatory Notes and Summaries.

## CONGRESSIONAL INTENT

It is fundamental that in construing the statutory language under consideration herein, the prime function of this court is to carry out the intent of Congress. United States v. British Cars & Parts, Inc., et al., 47 CCPA 114, C.A.D. 741 (1960). Thus, defendant has contended, in effect, that the intent of Congress is found by an examination of the Explanatory Notes and the Summaries, which restrict the scope of heading 73.07 and item 608.25 respectively to rough forgings requiring considerable further shaping. However, defendant has presented no cogent argument which establishes to my satisfaction that either of

the above mentioned publications are demonstrative or indicative of congressional intent in this case.

## A.

### TARIFF CLASSIFICATION STUDY SUBMITTING REPORT

The United States Tariff Commission, pursuant to congressional delegation,[2] prepared the present tariff schedules for final adoption by Congress.[3] In addition to preparing the proposed tariff schedules, the Tariff Commission prepared a Tariff Classification Study which includes a submitting report and seven supplemental reports. The Tariff Classification Study, published prior to the enactment of the TSUS, is regarded by the courts as a source of legislative history of the TSUS. See Rifkin Textiles Corp. v. United States, 54 CCPA 138, C.A.D. 925 (1967). In the submitting report, at page 8, under the heading entitled "Influence of other classifications systems," the Tariff Commission stated:

The first task which confronted the Commission in the preparation of the revised and consolidated tariff schedules was that of developing a logical, orderly, and systematic outline of provisions. To this end, a number of existing tariff, commodity, and industrial classification systems were carefuly studied. Included among these systems were the "Nomenclature for the Classification of Goods in Customs Tariffs' (usually referred to as the "Brussels Nomenclature"), "Standard Industrial Classification Manual," "Standard International Trade Classifications," "Schedule A, Statistical Classification of Commodities Imported Into the United States," and "Schedule B, Statistical Classification of Domestic and Foreign Commodities Exported From the United States." As a result of such study, a tentative outline

of proposed schedules was developed which evolved into the outline of the schedules reproduced at the end of this report. The proposed arrangement is not exactly like any of the above mentioned classification systems, but an effort was made to incorporate as many desirable features of each of them as possible. The "Brussels Nomenclature" and the "Standard Industrial Classification Manual" exerted the greatest influence on the arrangement of the proposed revised schedules.

## B.

### THE BRUSSELS NOMENCLATURE AND EXPLANATORY NOTES

In view of the fact that the Brussels Nomenclature had great influence upon the arrangement of the proposed revised schedules, this court in many cases has referred to that classification system (including its explanatory notes) as another source of legislative history for the TSUS. For example, see Pacific Suppliers, Ltd., et al. v. United States, 62 Cust.Ct., C.D. 3819, 299 F.Supp. 1134 (1969); Jerome Trading Corp. v. United States, 62 Cust.Ct., C.D. 3742 (1969); Intercontinental Air Freight, Inc. v. United States, 62 Cust.Ct., C.D. 3731 (1969); King Athletic Goods Co. v. United States, 61 Cust.Ct. 361, C.D. 3633, 293 F.Supp. 430 (1968); James S. Baker (Imports) Co. et al. v. United States, 61 Cust.Ct. 305, C.D. 3619 (1968); I. Pukel v. United States, 60 Cust.Ct. 672, C.D. 3497, 286 F.Supp. 317 (1968); Freni v. United States, 60 Cust.Ct. 319, C.D. 3375, 283 F.Supp. 89 (1968); J. E. Bernard & Co., Inc. v. United States, 60 Cust.Ct. 296, C.D. 3372, 282 F.Supp. 476 (1968); Amalgamated Sugar Company v. United States, 60 Cust.Ct. 268, C.D. 3361, 281 F.Supp. 373 (1968); F. L. Smidth & Company v. United States, 59 Cust.Ct. 276, C.D. 3141, 273 F.Supp. 384 (1967), aff'd 56 CCPA, C.A.D. 958 (1969); Pit-

---

2. Customs Simplification Act of 1954, Public Law 83-768, (68 Stat. 1136, approved September 1, 1954).

3. The tariff schedules became effective August 31, 1963 by virtue of Presidential Proclamation 3548.

ney-Bowes, Inc. v. United States, 59 Cust.Ct. 181, C.D. 3116, 273 F.Supp. 403 (1967).

In a recent opinion of the appellate court in *Smidth, supra*, some reservation was expressed concerning reliance upon legislative history in the absence of ambiguity, particularly with reference to the use of the Explanatory Notes. The appellate court stated (Customs Bulletin, Vol. 3, No. 21, page 74):

> * * * As the language is unambiguous, we need not resort to an extrinsic aid as the court below did, to sustain our conclusion. It referred to the explanatory notes to the "Brussels Nomenclature." This "Nomenclature" was put forth by the Customs Cooperation Council, an international organization, for adoption by its member nations, with the idea that their tariff items might be made uniform in phraseology, even if the rates were different, and this phraseology, becoming familiar, would help trade by reducing the uncertainty of exporters as to how their exports would fare with the customs of trading partners.

> It would have been possible, perhaps within the statutory mandate, to recommend our nation's adoption of the Brussels Nomenclature, but the Commission elected not to do so. However, it did adopt much of the Brussels phraseology in some of its schedules. The court below has therefore quite frequently referred to the Brussels explanatory notes as legislative history. * * *

> If a person has to send to Brussels for the Nomenclature and explanatory notes thereto before being able to interpret the United States tariff, this might seem to some as customs complication, not simplification. If, however, a tariff item is seen as genuinely ambiguous, as the court below, mistakenly we think, deemed item 661.30 to be, it is difficult to criticize lawyers and judges for seeking light wherever they can find it.

Similarly, in J. M. Altieri v. United States, 62 Cust.Ct., C.D. 3687, 295 F. Supp. 269 (1969), this court declined to read into the TSUS provision, covering pruning knives, certain limitations referred to in the Tariff Classification Study and the Summaries of Trade and Tariff Information in the absence of ambiguity. However, in *Pacific Suppliers, Ltd., supra*, it was pointed out that although legislative history is usually resorted to for the purpose of resolving ambiguity, it may also be studied to ascertain whether a literal interpretation conflicts with the intent of Congress, or whether certain words are employed with a meaning different from that usually given them.

In any event, whether or not the provision for forgings in item 608.25, TSUS is regarded as ambiguous (and defendant has not contended that there is ambiguity), I see no valid basis for "resorting to" the Explanatory Notes in the present case. I find nothing which suggests that the Tariff Commission, in its proposed item 602.25, adopted the provision in the Brussels Nomenclature for "pieces roughly shaped by forging" (heading 73.07).

It is emphasized that in prior decisions where reference was made to Brussels, the court found a nexus between the latter and the TSUS provision being construed. Such nexus was identical or similar phraseology between the Brussels and TSUS provisions. Consequently, the meaning ascribed to the former was taken as evidence of the meaning intended by the Tariff Commission. See e. g., *Bernard, Pitney-Bowes*, and *Baker, supra*.

On the other hand, where the phraseology of the Brussels Nomenclature and the TSUS item under consideration differed somewhat, this court did not rely upon Brussels as a guide to the intention of the Tariff Commission or the Congress. See Hollywood Accessories, Division of Allen Electronics & Equip. Co. v. United States, 60 Cust.Ct. 360, C.D. 3391, 282 F.Supp. 499 (1968). For primarily this reason, I decline herein to rely upon

the Explanatory Notes as any indicia of legislative intent in construing item 608.25.

Heading 73.07 of the Brussels Nomenclature, so far as is pertinent, provides for "pieces roughly shaped by forging, of iron or steel." The Explanatory Notes interpret such provision as follows (Volume 2, Chapter 73, heading 73.07, page 663):

> *Pieces roughly shaped by forging* are also merely semi-finished products of rough appearance and large dimensional tolerances, produced from blocks or ingots by the action of power hammers or forging presses. They may take the form of crude recognisable [sic] shapes in order that the final article can be fabricated without excessive waste, but the heading covers *only* those pieces which require considerable further shaping in the forge, press, lathe, etc. The heading would, for example, cover an ingot roughly hammered into the shape of a flattened zigzag and requiring further shaping to produce a marine crankshaft, but it would *not cover* a crankshaft forging ready for final machining. The heading similarly *excludes* drop forgings and pressings produced by forging between matrices since the articles produced by these operations are ready for final machining.

> Blooms, billets, slabs, sheet bars and pieces roughly shaped by forging, of alloy or high carbon steel are *excluded* (heading 73.15). [Emphasis in original.]

In view of the substantially different phraseology used in item 608.25, it must be presumed that the interpretation of the Brussels provision, *supra*, was not adopted by the Tariff Commission.

## C.

### FIRST SUPPLEMENTAL REPORT OF THE TARIFF CLASSIFICATION STUDY

Additionally, the Tariff Commission's own explanatory note to item 608.25 in the First Supplemental Report of the Tariff Classification Study, page 48, published prior to the enactment of the TSUS, indicates that there was no adoption of heading 73.07. That comment states:

> *Explanation:* A statement made to the Ways and Means Committee claimed that the proposed treatment of forgings in item 657.05 (part 3G of schedule 6) involves significant reductions in the rates of duty presently applicable to alloy forgings under paragraph 319(a) of the tariff act. These reductions are said to occur by reason of the fact that the proposed provisions do not reflect the additional duties applicable to alloy iron or steel under paragraph 305 of the tariff act.

> It is apparent, upon reexamination, that the inclusion of the provisions for forgings in the "basket" provisions of part 3G of schedule 6 was predicated upon inadequate information with regard to the nature of these products, and that they properly belong in part 3B. The above provisions reflect existing rates of duty in paragraph 319 (a) of the tariff act and the alloy duties imposed under paragraph 305.

As indicated by the foregoing comment, the Tariff Commission, originally proposed that forgings of iron or steel were to be classified under the "basket" provision in item 657.05, which read as follows:

> Articles of iron or steel, not coated or plated within precious metal:

> > Forgings, not machined, tooled or otherwise processed after forging

For the reasons explained by the Tariff Commission in its comment, *supra*, the provision for forgings of iron or steel, as originally proposed, was changed. As finally proposed by the Tariff Commission and enacted by Congress, forgings appear in a superior heading with inferior headings thereunder, depending upon whether or not the forgings are alloy iron or steel. As originally pro-

posed and as finally enacted, the provision for forgings in the TSUS bears a striking resemblance to that in paragraph 319(a) of the Tariff Act of 1930, which reads as follows:

Forgings of iron or steel, or of combined iron and steel, not machined, tooled, or otherwise advanced in condition by any process or operation subsequent to the forging process, not specially provided for [4]

In light of the foregoing, I have concluded that the Tariff Commission, in proposed item 608.25, which was enacted by Congress, did not elect to follow either the phraseology or arrangement set forth in the Brussels Nomenclature, and I may not read into item 608.25 the interpretation of the Brussels provision, as urged by the Government.

### D.

### SUMMARIES OF TRADE AND TARIFF INFORMATION

As previously mentioned, defendant also relies upon the Summaries, but offers no explanation of why that publication should be considered authoritative with respect to the interpretation of item 608.25.

The current Summaries are published from time to time by the United States Tariff Commission and when finally completed will consist of sixty-two volumes. The material therein presents information in terms of the tariff items covered in the eight tariff schedules of the TSUS. The purpose and scope of the Summaries are best conveyed by quoting directly from the "Foreword" set forth in Schedule 6, Volume 1:

Through its professional staff of commodity specialists, economists, lawyers, statisticians, and accountants, the Commission follows the movement of thousands of articles in international commodity trade, and during the years of its existence, has built up a reservoir of knowledge and understanding, not only with respect to im-ports but also regarding products and their uses, techniques of manufacturing and processing, commercial practices, and markets. Accordingly, the Commission believes that, when completed, the current series of summaries will be the most comprehensive publication of its kind and will present benchmark information that will serve many interests. This project, although encylopedic, attempts to conform with Chairman Taussig's admonition to be "exhaustive in inquiry, and at the same time brief and discriminating in statement."

It is apparent that the present Summaries relied upon by defendant are publications of the Tariff Commission *after* the enactment of the tariff schedules by Congress, and thus cannot be considered indicia of congressional intent.

In the past, three series of summaries of tariff information on commodities were published: in 1921, 1929 and 1948–50. Although the courts have considered summaries which were before Congress at the time of the passage of the tariff acts as authoritative for the purpose of resolving questions relating to the meaning and scope of tariff provisions, summaries published *after* the enactment of the tariff act have been held to be not controlling in determining congressional intent. Hence, the 1929 Summary of Tariff Information is regarded as authoritative with respect to the Tariff Act of 1930. See Textile Printing & Finishing Co., Inc. v. United States, 49 CCPA 24, C.A.D. 789 (1962); United States v. J. Eisenberg, Inc., 43 CCPA 105, C.A.D. 616 (1956). But with respect to the 1948 Summaries, the court held in Edward Hyman Co. v. United States, 52 Cust.Ct. 133, 141, C.D. 2450 (1964), aff'd 52 CCPA 51, C.A.D. 857 (1965):

The unsupported statement quoted, *supra*, from the 1948 Summaries of Tariff Information to the effect that cotton wipers are dutiable as polishing

---

4. As modified by T.D. 54108.

cloths, dustcloths, and mop cloths, not only tends to run counter to the literal meanings of such terms, but also seems to enlarge upon the effective scope thereof, as contemplated by Congress at the time the provision in question was enacted. Whereas Congress is chargeable with notice of comments contained in the 1929 Summary of Tariff Information, which was before it at the time of enactment of the Tariff Act of 1930, it did not legislate in the light of observations made some 19 years later and conclusions contained in the 1948 summaries are not necessarily controlling of congressional intent. * * *

Similarly in Dodge & Olcott, Inc. v. United States, 45 CCPA 113, C.A.D. 683 (1958), our appellate court commented as follows (at 116–117):

* * * This [statement in Summaries of Tariff Information (1948)] is urged by the government as a controlling statement. This Summary was prepared in response to a resolution of the Ways and Means Committee of the House of Representatives to "rewrite or otherwise bring up to date * * * the commodity summaries of tariff information."

It appears to us that a compilation prepared by some unidentified person, for a congressional committee, *after* the involved laws have been enacted, is not necessarily controlling in determining the intent of the enactors of the statute or negotiators of a treaty. At best, the Summary is an opinion or conclusion of some person or persons not necessarily reflecting the intent of the enactors or negotiators. It is our task to say what effect G.A.T.T. had on the duty on safrol and we are not influenced by the opinion of someone unknown, presumably based on no better information than we have. There is not in this case any question of legislative adoption of the opinion expressed in the Summaries, or of any treaty made on the basis thereof. [Emphasis in original.]

But in International Selling Corp. v. United States, 62 Cust.Ct., C.D. 3669, 294 F.Supp. 642 (1969), the court in construing a TSUS provision, stated that the Tariff Commission was undoubtedly familiar with certain comments in the 1948 Summaries.

Plainly then, the current Summaries— published *after* the enactment of the TSUS—can be accorded no more interpretative significance with respect to the TSUS than the Summary of Tariff Information (1948) was accorded relative to the Tariff Act of 1930. But, see Tanross Supply Co., Inc. v. United States, 63 Cust.Ct.C.D. 3870 (1969).

Moreover, I am unable to agree that the following quotation from the Summaries, Schedule 6, Volume 4, page 91, correctly reflects congressional intent:

The forgings classifiable for tariff purposes under items 608.25 and 608.27 are semifinished products of rough appearance that require considerable further shaping. * * *

If Congress had intended to exclude from item 608.25 all except "roughly forged pieces of iron or steel" (*ibid.* at 95) which require considerable further shaping, as urged by defendant, restrictive language appropriate to accomplish that purpose (such as appears in heading 73.07 of the Brussels Nomenclature) would undoubtedly have been used. As similarly pointed out in *Dodge, supra,* it is the function and responsibility of the courts to interpret legislation enacted by Congress. This court should not be bound by the legal interpretations of the TSUS by the Tariff Commission expressed in its Summaries published after Congress has already considered and enacted the tariff schedules, however useful that publication may be for other purposes.

It is also noted that much of the description of forgings in the Summaries is couched in phraseology similar to that appearing in the Explanatory Notes under heading 73.07. But, as concluded above, there is no indication of any nexus

between the Brussels and TSUS provisions.

The only decision which by research has discovered construing item 608.25, TSUS is J. Gerber & Co., Inc., et al. v. United States, 62 Cust.Ct., C.D. 3773, 298 F.Supp. 516 (1969), involving certain forgings dedicated to use as pipe fittings. Although the forging operations are not described therein, the following comments of the court are of particular pertinence here (Customs Bulletin, Vol. 3, No. 18, pages 44–45):

> \* \* \* The facts in the case show that each of the rough forgings is of a *particular form* and intended for ultimate use as a pipe fitting, not, however, by reason of having been machined, tooled, or otherwise processed after forging, but *solely because of the shape in which the articles were forged.* (It would seem well to here repeat that the subject merchandise was not processed after forging.) On this record, we would have to doubt that forgings are ever made without a predetermined ultimate use which determines the form in which the forgings are made. While the forgings here involved are cast into form so as to be ultimately processed into pipe fittings, they have not been advanced in manufacture after being forged. They were imported in the condition in which forged, nothing having been done to them after they were forged. [Emphasis added.]

> It seems clear to us that item 608.25 refers to forgings as they first arrive in commerce in their rough forged condition, not machined, not tooled, and not otherwise processed after forging. The provision convinces us that forgings which might be regarded as unfinished pipe fittings are within item 608.25, provided they are not machined, not tooled, and not otherwise processed after forging. \* \* \*

I hold that notwithstanding the instant articles do not require considerable further shaping, but are in a particular form for their intended ultimate use as a base

for wire rope clip, they are nevertheless rough forgings. Cf. also Newman-Andrew Co. v. United States, 2 Ct.Cust. Appls. 4, T.D. 31570 (1911).

## "PROCESSED AFTER FORGING"

Finally, I consider whether the instant forgings were "processed after forging."

Defendant's emphasis upon the distinction between hammering and punching and the different dies used in those respective operations, is apparently predicated upon the basis that the forging process ends with hammering. However, I find that punching was merely the process of trimming or removing flash, which is a normal incident in the manufacture of forgings. See Metals Handbook, *supra,* at page 114. Moreover, it is significant that from the time the steel billets were heated to forging temperature until they were dropped into a metal box, there was no appreciable drop from the forging temperature of the steel. This indicates, in my opinion, a continuity of the forging operations from the initial heating phase through the cooling of the rough forgings in the metal box. Therefore, I have concluded that punching in this case, although distinct from hammering, was not a "process after forging" which would exclude the merchandise from the purview of item 608.- 25.

Additionally, this court has recognized that certain processing subsequent to hammering may be incidental to the forging operation, and therefore not an operation subsequent to forging.

For example, in E. Dillingham, Inc., et al. v. United States, 61 Cust.Ct. 33, C.D. 3522 (1968), rehearing 52 Cust.Ct. 147, C.D. 2452 (1964), certain axhead forgings were in issue. They were produced in a manner very similar to the merchandise in the present case, including the punch press operation, by which the excess metal that had accumulated around the edges of the drop die cavity after hammering was sheared off. Additionally, however, the axhead forgings were subjected to a grinding operation to re-

move any sharp burrs or slivers of steel resulting from the forging operations. The collector classified the axhead forgings as cutting tools under paragraph 396 of the Tariff Act of 1930, as modified. Plaintiffs claimed *inter alia* that the merchandise was properly dutiable under paragraph 319(a), as modified, as forgings of iron or steel, not machined, tooled, or otherwise advanced in condition by any process or operation subsequent to the forging process.

In *Dillingham,* defendant raised no question concerning the punch press operation, as in the present case, but the last operation of grinding presented the issue for determination. In this court's original decision (C.D. 2452), following the reasoning in United States v. Anderson & Co., 2 Ct.Cust.Appls. 350 T.D. 32080 (1911), and Ford Motor Co. v. United States, 19 CCPA 69 T.D. 44897 (1931), it was held that the axheads were not forgings within the purview of paragraph 319(a) since they had been subjected to a process after forging, which advanced them beyond forgings. However, on rehearing, the court concluded that grinding off dangerous excrescences in creating the forgings was not an advance in condition, nor an operation subsequent to the forging process, but rather a manipulation incident to creating a merchantable forging, and part of the forging process.

In arriving at its conclusion, the court distinguished *Anderson* wherein the grinding was a finishing operation or a final step in the manufacture of the articles as contrasted to the grinding on the rough axheads which was an intermediate step, and hence part of the forging process. *Ford* was distinguished on the basis that the grinding or "profiling" operation involved therein "presented a clear-cut further step in manufacture, even to the point that such step was specially isolated to Canada for its performance."

The rationale of this court's opinion on rehearing in *Dillingham* is applicable in resolving the issue presented herein.

It is clear that the last hammer fall does not *ipso facto* terminate the forging process. Further, the record is clear that the punching operation in this case was not a finishing or final step in the manufacture of the wire rope clip bases; nor can it be considered a clear-cut further or isolated step in the manufacture of the articles. Removal of the flash by the punching operation, while still at forging temperature, was clearly incidental to creating the forgings, and hence still part of the forging process.

In view of the foregoing, I find that the punching operation was not a "process after forging," and thus does not exclude the instant forgings from the purview of item 608.25, TSUS. The protest claim under item 608.25 is sustained, and judgment will issue accordingly.

RAO, Chief Judge (concurring).

I concur in the result solely on the ground that the merchandise involved herein consists of forgings of iron or steel, not machined, not tooled, and not otherwise processed after forging, of other than alloy iron or steel, and therefore falls within item 608.25.

According to the record the merchandise is manufactured by the following process: Steel billets are heated in a furnace to forging temperature and are then taken to the forging hammer where they are beaten into a platter or string of forgings of the shape desired. The platter, still at forging temperature, is put into another machine called a punch press where the separate forgings are punched out of the platter. In this operation the flashings or scrap metal surrounding the basic shapes are removed and holes which are part of the shape are completely punched out. It appears from the photograph of the merchandise in various stages (figure 9 of exhibit 2) that the contour of the platter included blind cavities. The punching process evidently removed the material in the center.

The issue here is whether the merchandise has been processed after forging. Obviously the first operation performed on the steel billet was a forging operation. The removal of the flashings and the punching out of the holes are also part of the forging process. Saltonstall v. Wiebusch & Hilger, 156 U.S. 601, 15 S.Ct. 476, 39 L.Ed. 549 (1895); E. Dillingham, Inc., et al. v. United States, 61 Cust.Ct. 33, C.D. 3522 (1968); McGraw-Hill Encyclopedia of Science & Technology, Volume 5, page 470; The Making, Shaping and Treating of Steel, 8th edition, pages 999–1001.

In the publication last cited, the following is included under the heading "Principal Forging Operations:"

> Piercing and punching are performed by forcing a solid punch into hot steel to form a cavity. Piercing is employed to make a blind cavity by displacement without removal of metal. Punching produces a hole that extends through the entire section and both displaces and removes metal in the form of a slug. * * *

The language in heading 73.07 of the Nomenclature for the Classification of Goods in Customs Tariffs, generally referred to as the Brussels Nomenclature, covering "pieces roughly shaped by forging, of iron or steel" is substantially different from that in the superior heading to item 608.25 of the Tariff Schedules of the United States. Therefore, consideration of the explanatory notes to the Brussels Nomenclature is not pertinent. Extrinsic aids may be resorted to where a statute is ambiguous or to verify a position otherwise arrived at, but not to create doubt where none exists. V. G. Nahrgang v. United States, 51 CCPA 76, C.A.D. 840 (1964); Rifkin Textiles Corp. v. United States, 54 CCPA 138, C.A.D. 925 (1967); Universal Transcontinental Corp. v. United States, 40 CCPA 54, C.A.D. 497 (1952); United States v. J. E. Bernard & Co., Inc., 42 CCPA 69, C.A.D. 573 (1954); C. J. Tower & Sons v. United States, 46 CCPA 36, C.A.D. 692 (1958).

The tariff provision here provides for forgings, not machined, not tooled, and not otherwise processed after forging. It may not be further limited by adding the word "rough."

FORD, Judge:
I concur in the result.