ALGOMA TUBE CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 80–9–01543

(Decided August 28, 1985)

*Barnes, Richardson & Colburn (E. Thomas Honey* and *John J. Galvin)* for plaintiff.

*Richard K. Willard,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, *John J. Mahon,* United States Department of Justice, Civil Division, for defendant.

RESTANI, *Judge:* This case concerns the tariff classification of unthreaded seamless alloy steel plain end oil well casing which has been quenched and tempered. This matter is before the court on plaintiff's motion for summary judgment and defendant's cross-motion pursuant to Rules 7 and 56 of the Rules of the United States Court of International Trade.

## I

The seamless alloy steel plain end oil well casing at issue conforms to the American Petroleum Institute's (API) specification SA for Grade N80 Oil Well Casing. This steel product has been heat treated by quenching and tempering to improve the steel's properties and characteristics such as yield strength, tensile strength, elongation efficiency and collapse resistance. Quenching is a process of rapidly cooling hot rolled steel usually by water spray to avoid transformation of the steel at temperatures above the martensite range.[1] Tempering consists of preheating previously quenched steel to a predetermined temperature below the critical range and then maintaining that predetermined temperature for a specified time before cooling.[2] Alternatively, the improvements due to quenching and tempering can be achieved by initially using a higher grade of steel in the manufacture of oil well casing. The plain end casing in the instant case was not threaded. Unlike quenching and tempering, threading is a mechanical process of machining, rather than a process of heat treating, steel.

The plain end oil well casing at issue was entered on May 4, 1979. The United States Customs Service (Customs) classified the merchandise under item 610.43 of the Tariff Schedules of the United States (TSUS) (1978) as alloy steel pipes conforming to the API specifications for oil well casing, threaded or otherwise advanced.[3] Accordingly, on June 1, 1979, the merchandise was liquidated at the

---

[1] The term "martensite range" refers to "the temperature interval between the temperature at which the formation of martensite [the hardest microconstituent of steel] initiates and the temperature at which the formation is complete." *McGraw-Hill Dictionary of Scientific and Technical Terms* 976 (3d ed. 1984).

[2] The critical range is a temperature range in which chemical transformations occur. *Webster's Third International Dictionary* 538 (15th ed. 1968).

[3] The relevant TSUS provisions in this case state:

Other:....................................
    Steel pipe conforming to the
    A.P.I. specifications for oil
    well casing and steel pipes
    and tubes of rectangular
    cross section, whether
    welded or seamless, having
    a wall thickness not less
    than 0.156 inch:
      Not threaded and not
      otherwise advanced:

\*      \*      \*      \*      \*      \*      \*

[Claimed]

rate of 11% *ad valorem* plus additional duties based on the alloy content. Plaintiff claims that the oil well casing should be classified under item 610.40 as alloy steel pipe conforming to the API specifications for oil well casing not threaded and not otherwise advanced with duties at the rate of 0.1 per pound plus 4% *ad valorem* plus additional duties on the alloy content.[4]

The issue presented in this case, therefore, is whether the quenching and tempering operations performed on the imported merchandise constitute advancement which would exclude the casings from classification under item 610.40. In resolving this dispute, the court must interpret the TSUS to reflect Congressional intent. *United States* v. *S.H. Kress & Co.,* 46 CCPA 135, 137, C.A.D. 716 (1959); *FAG Bearings, Ltd.* v. *United States,* 9 CIT 227, Slip Op. 85–52 at 3 (1985) (citing *United States* v. *Siemens Amercia, Inc.,* 68 CCPA 62, 68, C.A.D. 1266, 653 F.2d 471, 476 (1981), *cert. denied,* 454 U.S. 1150 (1982)). When construing the TSUS, all parts of the statute must be read together and all relevant headnotes should be considered. *Lyons Export & Import, Inc.* v. *United States,* 59 CCPA 142, 146, C.A.D. 1056, 461 F.2d 830, 833 (1972) (citing *R.H. Macy & Co.* v. *United States,* 57 CCPA 115, 118, C.A.D. 988, 428 F.2d 856 (1970)).

Headnote 1, Part 2, Schedule 6 of the TSUS states in pertinent part:

> *Unless the context requires otherwise,* the provisions of [part 2] apply to the products described by whatever process made (i.e., whether rolled, forged, drawn, extruded, cast or sintered) and whether or not such products have been subjected to *treatments to improve the properties* or appearance of the metals or to protect them against rusting, corrosion or other deterioration. *These treatments include* annealing, *tempering,* case-hardening *and similar heat-treatments* or nitriding; descaling, pickling, scraping, scalping and other processes to remove oxidation scale and crust; rough coating with oil, tar, grease, red lead, or other material to prevent rusting; polishing, burnishing, glazing, artificial oxidation, phosphatizing, and other finishing treatments; metallization by cementation, by electroplating, by immersion in a bath of molten metal, or by other means; coating with enamel, paint, lacquer, or other non-metallic substances; and cladding * * *

(emphasis added).

Plaintiff argues that there is no language in item 610.40 which would preclude the products and processes of Headnote 1 from the purview of that item. Plaintiff claims that Congress uses explicit

---

| 610.40 | Alloy steel 20.'s ............... | 0.1 per lb. + 4% ad val. + additional duties (see headnote 4) |
| | Threaded or otherwise advanced: | |
| * | * * | * * * * |
| [Classified] 610.43 | Alloy steel 20.'s............... | 11% ad val. + additional duties (see headnote 4) |

[4] Plaintiff does not contest the additional duties based on the alloy content.

language when it creates exceptions to the general provisions of Headnote 1. Furthermore, plaintiff argues that under the interpretive principle of *ejusdem generis,* the language of item 610.43 mandates that only mechanical processes such as threading constitute advancement and that advancement under item 610.43 does not include thermal processes.

Defendant claims that Headnote 1 is inapplicable to classification under item 610.43. Defendant argues that Congress does not always explicitly state the elements of advancement in Part 6 of the TSUS. Defendant also claims that because the oil well casing would meet the relevant API specifications without the thermal operations, quenching and tempering constitute advancement under item 610.43. The government notes that this court's predecessor held that similar heat treatments were advancements under the TSUS.

According to defendant, this matter is controlled by the decisions in *Karl Schroff & Assoc.* v. *United States,* 67 Cust. Ct. 4, C.D. 4244 (1971), *Edward W. Daniel Co.* v. *United States,* 67 Cust. Ct. 132, C.D. 4264 (1971), and *F.W. Myers & Co.* v. *United States,* 45 Cust. Ct. 124, C.D. 2210 (1960). The *Schroff* case concerned steel gate valves that underwent a heat treatment called normalizing, which like quenching and tempering improved the consistency of steel. Plaintiffs urged that the values were classifiable under TSUS item 608.25 as "forgings of iron or steel, not machined, not tooled, and not otherwise processed after forging." Ruling against the plaintiff, the court explained that normalizing is performed after a forged product has cooled. Therefore, the language "not otherwise processed after forging" created a specific context in which the exception for normalizing set forth in Headnote 1, part 2 did not apply. The *Daniel* case, which was decided in the same year, involved normalized steel bolts, and classification under item 608.25 was denied for the reasons set forth in *Schroff.*

The *F.W. Myers* case concerned the classification of dry sand carbon steel or alloy steel castings for valves which were heat treated by annealing after casting. The annealing process was required by engineering specifications. Because the annealing process, which occurred after casting, advanced the castings beyond the status of castings, plaintiff's claim that the product was classifiable under the tariff provision then in force for steel castings failed.

The three cases cited by defendant, however, offer little guidance in the instant case. The relevant provisions in both *Schroff* and *Daniel* contained language concerning the timing of phases in the production process which rendered the provisions of Headnote 1 inapplicable. The *Myers* case construed tariff provisions which contained neither the word "processed" nor the word "advanced." The decision rested in part on the timing of the heat treatment, but primarily on the fact that the article no longer fit the definition of "castings." Defendant here does not argue that the article at issue is

no longer an oil well casing of the appropriate dimensions or specifications.

Thus, the primary guide to the disposition of this case is not judicial precedent, but rather, the tariff schedules themselves. The words of the tariff schedules, like the words of any statute "must be construed in context and the statutes must be harmonized, both internally and with each other, to the extent possible." *Pacific Mutual Life Insurance Co.* v. *American Guaranty Life Insurance Co.,* 722 F.2d 1498, 1500 (9th Cir. 1984). It is "fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and in fulfilling [its] responsibility in interpreting legislation, [the court] must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy." *Richards* v. *United States,* 396 U.S. 1, 11 (1961) (quoting *United States* v. *Heirs of Boisodore,* 49 U.S. (8 How.) 113, 122 (1849)); *see also Puerto Rico* v. *Shell Co.,* 302 U.S. 253, 258 (1937); *Sea-Land Service, Inc.* v. *United States,* 493 F.2d 1357, 1364 (Ct. Cl. 1974), *cert. denied,* 419 U.S. 840 (1974). Thus, the court must look to related items in Schedule 6.

Defendant argues that Congress does not always mention a thermal process specifically when excepting it from the purview of Headnote 1 of Schedule 6. However, an overall review of Schedule 6 yields the conclusion that Congress specifically invokes words referring to thermal and chemical processes when creating exceptions to Headnote 1, or uses other clearly limiting language. The government itself notes the reference in items 608.70 to 608.78 to tempered (a heating process) and non-tempered wire rods, as well as a similar reference in items 608.84 to 608.88 to pickled (a chemical process) and non-pickled plates and sheets of iron or steel. Items 608.70 to 608.78 also mention the words "treated" and "non-treated." See also *Scroff* and *Daniel,* discussed previously.

Thus, Congress does use specific terminology when creating exceptions to the normal rule regarding thermal treatment processes. "[W]here a particular provision appears in a statute, the failure to include that same provision in another section will not be deemed to have been inadvertent." *Kentucky ex rel. Hancock* v. *Ruckelshaus,* 362 F.Supp. 360, 365 (W.D. Ky 1973), *aff'd* 497 F.2d 1172 (6th Cir. 1974), *aff'd sub nom, Hancock* v. *Train* 426 U.S. 167 (1976) (citing 2J Sutherland, *Statutory Construction,* 4915 (3rd ed. 1943); *see Dunlop* v. *First National Bank of Arizona,* 399 F.Supp. 855, 856 (D.Arix. 1975); *see also* 2A Sutherland, *Statutory Construction,* S47.23 (4th ed. 1984). This hoary maxim seems to have particular vitality when applied to carefully constructed and intertwined statutory provisions such as those found in Schedule 6 of the TSUS. Had Congress wished to exclude the thermal processes of quenching and tempering from

item 610.40, it simply would have added clear language to that effect, as it did in other items of the same Schedule.[5]

Additionally, precedent does provide some support for the claimed classification. *United States* v. *Philipp Overseas, Inc.,* 68 CCPA 43, C.A.D. 1263, 651 F.2d 747 (1981) involved the classification of stainless steel angles which had been annealed and then chemically treated by "pickling." The government classified the product under item 609.86 as angles, shapes and sections—drilled, punched, or otherwise advanced. The Customs Court ordered reclassification under item 609.82 as alloy or steel angles. *Philipp Overseas, Inc.* v. *United States,* 84 Cust. Ct. 200, C.D. 4859, 496 F. Supp. 273 (1980). The Court of Customs and Patent Appeals affirmed. Resting its decision on the canon of statutory construction, *ejusdem generis,* the CCPA explained:

> We do, however, on the basis of *ejusdem generis,* conclude that it would be stretching the matter to hold that even though headnote 1 expressly allows annealing and pickling, "Drilled, punched, or otherwise advanced" in the heading superior to Item 609.86, modifies that allowance pursuant to the phrase in headnote 1, "Unless the context requires otherwise."

> Drilling and punching are not *ejusdem generis* with annealing and pickling, and we therefore hold that the context of the heading superior to Item 609.86 is not one which "requires otherwise."

*Philipp Overseas,* 68 CCPA at 49, 651 F.2d at 75.

"*Ejusdem generis* means literally of the same kind.' It is a rule which the courts have applied as an aid to interpreting the intent to the legislature, in providing for a class of articles, after first specifically enumerating two or more members of that class." *Kotake Co.* v. *United States,* 58 Cust. Ct. 196, 199, C.D. 2934, 266 F. Supp. 385, 387 (1967) (citing *G.F. Goldkamp & Co.* v. *United States,* 39 Cust. Ct. 420, Abs. No. 61,194 (1957)). *See generally Sutherland Stat Const* § 47.17 (4th Ed. 1984). In the instant case, the class of enumerated articles contains only a single defining term, that is, "threaded." Thus, it is more difficult to determine what common element is found among the processes indicated by the words "otherwise advanced," than it would be in the case of a statute with several defining terms. Nonetheless, because the state achieved by the heating processes involved here may be attained by using a higher grade of steel initially, it is unlikely that the heating processes result in the article being "otherwise advanced" within the meaning of this statute. Furthermore, the facts of the instant case closely parallel those in *Philipp Overseas.* Both cases involve attempts by Customs to classify heat or chemically treated products under provisions which speak only of mechanical processes such as drilling or threading.

---

[5] Defendant's argument that quenching and tempering constitute advancement because such processes are not required by API specifications lacks merit. The tariff provision does not refer to "otherwise advanced" beyond the lowest state necessary to meet API standards.

Unlike the provisions at issue in *Daniel*, in *Schroff*, and perhaps, in *Myers*, the relevant tariff provisions in this case and in *Philipp Overseas* do not involve the time in the production process at which the relevant treatment occurs. Given the entire structure of Schedule 6 and the context of the use of the word "advanced" in the item at issue, the court finds that quenching and tempering do not cause the casings involved here to be "otherwise advanced."

Accordingly, plaintiff has overcome the presumption of correctness attaching to defendants' classification. Plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The District Director of Customs is directed to reclassify the subject merchandise under item 610.40, TSUS.